JAMES EDWARD BENT, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11963-80.        Filed July 28, 1986.

James Edward Bent, pro se.
*Joellyn R. Cattell*, for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal individual income tax against petitioner for 1977 in the amount of $5,402.38. After concessions by respondent, the issues for decision are as follows:

(1) Whether a $24,000 settlement payment to petitioner from Marshallton-McKean School District, in settlement of litigation, is excludable from gross income under section 104(a)(2);[1] and

(2) Whether petitioner is entitled to a deduction for the amount paid as legal fees, if the settlement payment is excludable.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner resided in Newark, Delaware.

Petitioner was hired by the Board of Education (hereinafter sometimes referred to as the board) of the Marshallton-McKean School District (hereinafter sometimes referred to as the district) as a secondary school teacher, beginning in September 1970. Petitioner taught in the area of Industrial Arts—Electronics Technology at McKean High School (hereinafter sometimes referred to as McKean). At this time, petitioner was 46 years old and, with the exception of a few months during the summer of 1970, he had never taught in public schools. Petitioner has a degree in biology and spent the majority of the 1950's and 1960's employed in the field of electronics, including overseas assignments. Although petitioner did not have an education degree, the board believed that, with his background and experience in the electronics industry, he was well-qualified to teach an electronics course at McKean. Petitioner's practical approach to the subject matter was consistent with the new teaching approach that was being experimented with at McKean.

For the first two school years, petitioner performed his duties to the apparent satisfaction of his superiors. In

---

[1]Unless indicated otherwise, all subtitle and section references are to subtitles and sections of the Internal Revenue Code of 1954 as in effect for the year in issue.

particular, petitioner was evaluated twice during each of these 2 school years; with the exception of certain comments about the lack of orderliness in his laboratory, his occasional inattention to detail and school procedures, and his tendency to use "rough" or "raw" language, petitioner's evaluations indicated satisfactory performance.

In addition to his duties as a high school teacher, petitioner was also active in the Marshallton-McKean Education Association (hereinafter sometimes referred to as "the association"), the collective bargaining representative for the teaching personnel in the district. In the 1972-73 school year, petitioner held the position of building representative; teacher complaints on various matters were channeled to the administration through him.

The approach to education at McKean was thought to be unsuccessful; beginning with the 1972-73 school year, two new administrators were hired at McKean.

On November 2, 1972, petitioner attended an open meeting of the board. Without the approval of the association, petitioner demanded the floor, and argued on a then-existing issue of whether the school custodians should be given the day off on election day. The association was dealing with this matter through other individuals; petitioner acted apparently outside his scope of authority as well as his area of concern. His conduct was distasteful to some members of the board and was not well received by the association. As a result, petitioner had misgivings about the security of his teaching position and he requested an evaluation of his progress as a teacher.

One of the new McKean administrators performed the evaluation on December 5, 1972. He noted that petitioner was "very direct and occasionally outspoken" and that while his sincerity was unquestionable, his method was subject to being misunderstood. The administrator concluded that petitioner would be recommended for reemployment the following year even though he would still have to undergo one final evaluation. Thereafter, in January 1973, petitioner attended an evening meeting of science teachers from several different schools; the other new McKean administrator also attended. Petitioner had admittedly been drinking before he attended this out-of-school meeting.

During the meeting, petitioner presented his views on how teaching should be accomplished. His remarks were directly critical of a computer education program instituted by the McKean administrator who attended this meeting. This administrator was personally offended by these remarks, as well as by other remarks which he considered unduly critical of the McKean administration.

On February 28, 1973, petitioner was given his final evaluation, this time by the administrator who had attended the science teachers meeting. This administrator stated that petitioner "displays unprofessional behavior by consistently downgrading the school, the staff, and the administration". This administrator concluded that petitioner should not be recommended for reemployment because "he does not exhibit the degree of professionalism expected of a professional educator."

When petitioner was informed of the contents of the evaluation, he made sarcastic remarks to a McKean administrator in the presence of other school personnel. Petitioner threatened legal action and set upon a course of late evening telephone calls to members of the board and to members of the association.

Subsequently, petitioner disclosed that he had secretly recorded telephone conversations with a McKean administrator and with the district's superintendent. On April 19, 1973, the board voted to terminate petitioner's employment and not to offer him a contract for the next school year. On May 3, 1973, the district's superintendent sent a letter to petitioner stating the reasons for the termination of petitioner's employment. The reasons given were those set forth in the February 28 evaluation and the fact that petitioner secretly recorded telephone calls.

Thereafter, petitioner asked for a hearing before the board, but this was rejected. His employment contract with the district expired on June 30, 1973. Petitioner never was granted tenure by the district. In August 1973, the board changed its position and decided to give petitioner a hearing. However, by this time, petitioner had accepted a teacher-training job at Temple University, beginning in September 1973, and his counsel was unavailable for a hearing. The board never held a hearing for petitioner.

In September 1973, petitioner sued the board, its members, and its secretary in the Court of Chancery of the State of Delaware in and for New Castle County (hereinafter sometimes referred to as "the Chancery Court"). The complaint set forth the following contentions:

9. The aforesaid actions of defendants have violated plaintiff's rights as follows:

a. Defendants have breached the said collective bargaining agreement in refusing to process plaintiff's grievance, in refusing to rehire plaintiff without just cause in violation of Article IIID, and in refusing to make specific suggestions for improvement, and refusing to make any effort to help the plaintiff correct his weaknesses and strengthen his performance in violation of Articles XIE and XIF.

b. The refusal to grant plaintiff a prompt hearing violated plaintiff's right to procedural due process, to which he is entitled under the Constitution of the United States and 42 U.S.C. §1983.

c. The arbitrary refusal to rehire the plaintiff violated his rights to substantive due process and free speech, in violation of the Constitution of the United States and 42 U.S.C. §1983.

d. The defendants' action imposed a stigma upon plaintiff which has foreclosed his opportunity to obtain other employment in education, in violation of the Constitution of the United States and 42 U.S.C. §1983.

e. The action of defendants deprived the plaintiff of property, in that consistent with the practice of defendants, plaintiff had an objective expectancy of reemployment and a consequent right to a hearing before being non-renewed, pursuant to the Constitution of the United States and 42 U.S.C. §1983.

10. As a result of the foregoing actions of defendants, all of which were taken in bad faith, plaintiff has been deprived of his employment in the Marshallton-McKean School District for 1973-74 and has been otherwise damaged.

In his complaint, petitioner asked the Chancery Court to "reinstate him and order the * * * [board] to tender a contract of employment for the balance of the 1973-74 school year, and award him incidental damages, attorney's fees, interest, costs and such other relief as the Court deems appropriate."

After a trial on the issue of liability, a decision was rendered on December 11, 1975, in which the Chancery Court concluded—

that the plaintiff, James E. Bent, is entitled to relief as a result of having been denied reemployment by the defendant Board of Education for reasons which, in part, abridged his First Amendment right to express

his views as to the public employer and school administrators for whom he worked—regardless of his obvious lack of tact in so doing.

Although he seeks both reinstatement as well as monetary damages, I am not prepared to conclude that reinstatement is automatically required by the above finding, and I am inclined to limit relief to monetary damages. Defendants reserved the right to be heard separately of the issue of the amount and form of recovery in the event that liability was established on their part.

In disposing of petitioner's other contentions, the Chancery Court determined that "it seems clear * * * that although plaintiff surely had an abstract concern in being rehired, he did not acquire a *property* interest sufficient to require the school authorities to give him a hearing when they declined to renew his contract of employment". (Emphasis in original.) In addition, the Chancery Court explained that "mere proof of his record of nonretention in one job * * * does not amount to the kind of foreclosure of opportunities which would constitute a deprivation of liberty. Also, since [petitioner] freely admits making the secret tape recordings, [there is] no denial of due process in failing to afford him a hearing to disprove that he did so."

The Chancery Court continued the case on the issue of money damages and both sides submitted briefs on this issue.

In his opening post-trial brief in the Chancery Court proceeding, petitioner stated as follows:

The Court deferred decision on damages and the parties have conferred and agreed that for purposes of briefing the special damages of the plaintiff shall be viewed as the following:

| | |
|---|---|
| Wage loss differential . . . . . . . . . . . . . . . | $4,000 per year |
| | (12,000 to date) |
| Blue Cross . . . . . . . . . . . . . . . . . . . . . . . | 300 per year |
| | (900 to date) |
| Commuting differential . . . . . . . . . . . . . . | 600 per year |
| | (1,800 to date) |
| Expense of seeking other employment . | 250 |
| Replacement of other fringe benefits . . | 3,000 |
| (annuity, group life policy, disability insurance, retirement benefits) | |
| Physicians bills and medication . . . . . . . | 200 |
| Attorneys' fees . . . . . . . . . . . . . . . . . . . . . | 12,000 |
| Total to date . . . . . . . . . . . . . . . . . . . . . . | 30,150 |

In addition [petitioner] seeks an award of general damages for the deprivation of his constitutional rights and for the pain, suffering, humiliation, mental anguish and disruption of career plans engendered by the non-renewal for an unconstitutional reason. This is [petitioner's] opening brief in support of his claim for damages.

On January 24, 1977, after an extended period of negotiations, the case was settled and petitioner's complaint was dismissed with prejudice. In settlement of his lawsuit, petitioner accepted a check for $24,000 from INA Insurance Companies (hereinafter sometimes referred to as INA).[2] Petitioner executed a general release in consideration of the settlement payment. Neither petitioner's release nor INA's check allocated any part of the settlement payment.

Petitioner paid $8,000 of the settlement payment to the Delaware State Education Association (hereinafter sometimes referred to as the State association). The State association had provided petitioner with legal representation in connection with the termination of his employment by the district, and the $8,000 payment was made by petitioner on account of this legal representation.

George Eichelberger (hereinafter sometimes referred to as Eichelberger), assistant manager for the INA office in Wilmington, Delaware, dealt with petitioner's claim against the board. Eichelberger approved the settlement payment of $24,000 to petitioner. The "Notice of Close-Out", a document prepared by INA, regarding the settlement of petitioner's claim against the district, states that petitioner's claim has been settled for $24,000—"12,000 Re-instatement of wage loss" and "12,000 Plaintiff attorney fees - recoverable as a specific item in civil rts cases".

Petitioner did not report the $24,000 settlement payment as income on his 1977 Federal individual income tax return. Petitioner deducted the $8,000 in legal fees on his 1977 return. Respondent determined that the $24,000 amount is includable in income on petitioner's 1977 return and, that, if the settlement payment is excludable, then the $8,000 paid as legal fees is not deductible.

---

[2] INA assigned an attorney to represent its policyholder, the District, in the Chancery Court proceedings.

The settlement payment was made on the basis of the Chancery Court's decision that petitioner's right to freedom of speech under the First Amendment to the United States Constitution had been abridged, in violation of 42 U.S.C. sec. 1983,

OPINION

Respondent contends that the $24,000 settlement payment is includable in gross income because it "represented compensation to [petitioner] for a wage differential for three years plus a negotiated attorney's fee." Respondent asserts also that petitioner is entitled to deduct legal fees only to the extent that the settlement payment is includable in gross income.[3] Petitioner maintains that the Chancery Court's decision that the district had abridged his First Amendment right to freedom of speech is a decision that this abridgement "constituted a tort, and, as such a personal injury" for section 104(a)(2) purposes. Thus, petitioner contends, the settlement payment is excludable from his gross income. Petitioner asserts further that the legal fees paid "reduce the amount paid to make him whole and as such, become a deductible item."

We agree with petitioner as to the excludability issue, and with respondent as to the deductibility issue.

## I. *Exclusion of Settlement Payment*

Section 61(a)[4] states that, except as otherwise provided, gross income means "all income from whatever source derived". Section 104(a)(2)[5] provides otherwise, in that it

---

[3] At trial, in her opening statement, respondent's counsel stated that respondent was considering moving to amend the answer to assert that all or part of petitioner's $8,000 legal fee deduction should be disallowed even if the Court were to hold (for respondent) that all of the $24,000 settlement payment is includable in petitioner's income. See sec. 6214(a). By the end of the trial, respondent's counsel decided not to offer such an amendment to answer.

[4] Sec. 61(a) provides, in relevant part, as follows:

SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle [i.e., subtitle A, relating to income taxes], gross income means all income from whatever source derived, * * *

[5] Sec. 104(a) provides, in relevant part, as follows:

SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) IN GENERAL.—Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include—

excludes from gross income damages received on account of personal injuries or sickness. However, the Internal Revenue Code of 1954 does not explain what a taxpayer must show in order to prove that the damages were received "on account of personal injuries." *Seay v. Commissioner*, 58 T.C. 32, 36 (1972).

Section 1.104-1(c), Income Tax Regs., provides that "The term 'damages received (whether by suit or agreement)' means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort-type rights, or through a settlement agreement entered into in lieu of such prosecution"; thus, it is not necessary that the damages be on account of physical trauma. *Church v. Commissioner*, 80 T.C. 1104, 1106 (1983). The essential element of an exclusion under section 104(a)(2) is that the damages must derive from some sort of tort (or tort-type) claim against the payor. *Glynn v. Commissioner*, 76 T.C. 116, 119 (1981), affd. without published opinion 676 F.2d 682 (1st Cir.1982); sec. 1.104-1(c), Income Tax Regs.

Section 104(a)(2) encompasses situations where the damages received are "by suit or agreement". In the context of a settlement agreement, determining the exclusion from gross income depends on the *nature* of the claim which was the actual basis for settlement, not the *validity* of the claim (*Seay v. Commissioner*, 58 T.C. at 37), the proper inquiry being in lieu of what were damages awarded. *Church v. Commissioner*, 80 T.C. at 1107; *Yates Industries, Inc. v. Commissioner*, 58 T.C. 961, 972 (1972), affd. without published opinion 480 F.2d 920 (3d Cir. 1973). If the settlement agreement lacks express language stating that the payment was (or was not) made on account of personal injury, then the most important fact in determining how section 104(a)(2) is to be applied is "the intent of the payor" as to the purpose in making the payment. *Knuckles v. Commissioner*, 349 F.2d 610 (10th Cir. 1965), affg. a Memorandum Opinion of this Court;[6] *Fono v. Commissioner*, 79 T.C. 680,

---

\* \* \* \* \* \* \*

(2) the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness;

[The subsequent amendment of this provision by sec. 101(a) of Pub. L. 97-473, 96 Stat. 2605, does not apply to the instant case.]

[6] T.C. Memo. 1964-33.

694 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984); *Glynn v. Commissioner*, 76 T.C. at 120.

In the context of a suit, if the trier of fact (jury or judge) does not indicate the basis on which the award was arrived, then to ascertain the nature of the damages it is necessary to examine the allegations contained in the taxpayer's complaints, the evidence presented, and the arguments made in the State court proceeding. *Church v. Commissioner*, 80 T.C. at 1107.

The first matter that we must determine is what the settlement settled. In his suit, petitioner complained that the board had violated his rights under the collective bargaining agreement and had violated several of his rights under the United States Constitution. As to the claimed violations of his rights under the United States Constitution, petitioner was suing for redress under 42 U.S.C. sec. 1983[7] (hereinafter sometimes referred to as sec. 1983).

The Chancery Court decision rejected all of petitioner's claims except the one that the board had "abridged his First Amendment[8] right to express his views as to the public employer and school administrators for whom he worked". This claim was one of those for which petitioner had sued for redress under sec. 1983. The Chancery Court rejected petitioner's contention that he was entitled to reinstatement but ruled that monetary damages was the appropriate redress and continued the case to determine the amount and form of such a redress. Both sides filed briefs on monetary damages in the Chancery Court.

---

[7] Sec. 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. * * *

[The subsequent amendments of this section by Pub. L. 96-170, 93 Stat. 1284, do not affect the instant case.]

[8] The First Amendment to the United States Constitution provides as follows:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The First Amendment right of freedom of speech is "protected by the Fourteenth Amendment from invasion by state action." *Lovell v. Griffin*, 303 U.S. 444, 450 (1938), and cases there cited.

It was in this setting that petitioner and the board settled the Chancery Court suit. Neither the general release that petitioner signed nor INA's settlement check allocated any part of the settlement payment. We conclude, and we have found, that the settlement payment was made on the basis of the Chancery Court's decision that petitioner's First Amendment right to freedom of speech had been abridged in violation of sec. 1983. In this light, we view the instant case as being equivalent to a situation where the settlement agreement provided the basis upon which the settlement payment was made. Accordingly in this situation, we need not engage in an analysis of the "intent of the payor" to establish the nature of the payment. See *Knuckles v. Commissioner, supra; Fono v. Commissioner, supra;* see also *Lyeth v. Hoey,* 305 U.S. 188, 195-197 (1938). However, this does not end our inquiry, for we must now ascertain the nature of a sec.1983 claim, in order to determine the tax consequences of the settlement payment. *Seay v. Commissioner, supra.*

In *Mitchum v. Foster,* 407 U.S. 225, 238-239 (1972), the Supreme Court provided the following historical overview of sec. 1983:

Section 1983 was originally § 1 of the Civil Rights Act of 1871. 17 Stat. 13. It was "modeled" on § 2 of the Civil Rights Act of 1866, 14 Stat. 27, and was enacted for the express purpose of "enforc[ing] the Provisions of the Fourteenth Amendment." 17 Stat. 13. The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment. As a result of the new structure of law that emerged in the post-Civil War era—and especially of the Fourteenth Amendment, which was its centerpiece—the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established. *Monroe v. Pape,* 365 U.S. 167; *McNeese v. Board of Education,* 373 U.S. 668; *Shelley v. Kraemer,* 334 U.S. 1; *Zwickler v. Koota,* 389 U.S. 241, 245-249; H. Flack, The Adoption of the Fourteenth Amendment (1908); J. tenBroek, The Anti-Slavery Origins of the Fourteenth Amendment (1951). Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation. [Fn. refs. omitted.]

With the enactment of sec. 1983, the Congress "create[d] a federal cause of action 'unknown at common law', [for] the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws [of the United States]",
*Almond v. Kent*, 459 F.2d 200, 204 (4th Cir. 1972).

The Supreme Court stated in *Carey v. Piphus*, 435 U.S.
247, 253 (1978), that the legislative history of sec. 1983[9]
"demonstrates that it was intended to '[create] a species of
tort liability' in favor of persons who are deprived of
'rights, privileges, or immunities secured' to them by the
Constitution. *Imbler v. Pachtman*, 424 U.S. 409, 417
(1976)." The right of recovery on the basis of a sec. 1983
claim depends on Federal considerations. *Almond v. Kent*,
459 F.2d at 204.

In *Wilson v. Garcia*, 471 U.S. 261 (1985), the Supreme
Court was faced with determining the appropriate New
Mexico statute of limitations to be applied to a sec. 1983
claim. Garcia brought an action under sec. 1983 against a
State police officer and the chief of the State police seeking
damages for deprivation of Garcia's constitutional rights
allegedly caused by an unlawful arrest and brutal beating
by the officer. First, the Supreme Court determined that
Federal rather than State law governs the characterization
of a sec. 1983 claim for statute of limitations purposes. 471
U.S. at 268-270. Second, the Supreme Court concluded that
all sec. 1983 claims should be characterized in the same
way. 471 U.S. at 270-275. Third, the Supreme Court held
that all sec. 1983 actions are best characterized as involving
claims for personal injuries. 471 U.S. at 276-279. Thus, the
State's statute of limitations for personal injury actions
applies to all sec. 1983 claims. See *Mazzanti v. Merek &
Co.*, 770 F.2d 34 (3d Cir. 1985); *Fitzgerald v. Larson*, 769
F.2d 160 (3d Cir. 1985); *Smith v. City of Pittsburgh*, 764
F.2d 188 (3d Cir. 1985); *Knoll v. Springfield Tp. School
Dist.*, 763 F.2d 584 (3d Cir. 1985). In reaching this
conclusion, the Supreme Court determined that while a sec.
1983 claim can be analogized to more than one of the
common law forms of action (471 U.S. at 272-274), "Con-
gress unquestionably would have considered the remedies
established in the Civil Rights Act to be more analogous to
tort claims for personal injury than, for example, to
claims for damages to property or breach of contract."

---

[9] The legislative history of sec. 1983 is detailed in *Monroe v. Pape*, 365 U.S. 167, 172-183
(1961); *id.* at 225-234 (Frankfurter, J., dissenting in part); *Mitchum v. Foster*, 407 U.S. 225,
238-242 (1972).

471 U.S. at 277. The Supreme Court explained as follows (471 U.S. at 277-278):

The unifying theme of the Civil Rights Act of 1871 is reflected in the language of the Fourteenth Amendment that unequivocally recognizes the equal status of every *"person"* subject to the jurisdiction of any of the several States. The Constitution's command is that all *"persons"* shall be accorded the full privileges of citizenship; no *person* shall be deprived of life, liberty, or property without due process of law or be denied the equal protection of the laws. A violation of that command is an injury to the individual rights of the person.

Relying on the language of the statute, the Court of Appeals for the Fourth Circuit has succinctly explained why this analogy is persuasive:

"In essence, § 1983 creates a cause of action where there has been injury, under color of state law, to the person or to the constitutional or federal statutory rights which emanate from or are guaranteed to the person. In the broad sense, every cause of action under § 1983 which is well-founded results from 'personal injuries.' " *Almond v. Kent*, 459 F.2d 200, 204 (CA4 1972).

[Emphasis in original; fn. ref. omitted.]

The Supreme Court concluded that "Had the 42d Congress expressly focused on the issue decided today, we believe it would have characterized sec. 1983 as conferring a general remedy for injuries to personal rights." 471 U.S. at 278.

The situation in the instant case is analogous to *Wilson v. Garcia* because in both cases the determinative inquiry involves the characterization of the nature of a sec. 1983 claim. Although the bottom-line issue (statute of limitations versus application of sec. 104(a)(2)) is different, the Supreme Court's analysis provides the answer to our inquiry.

Section 104(a)(2) excludes from gross income "any damages received * * * on account of personal injuries". Section 1.104-1(c), Income Tax Regs., states that damages are excludable if received on account of a legal suit or action involving tort or tort-type rights. From this Treasury Regulation, the validity of which is not in question, it is apparent that excludable damages need not be restricted to those suits or actions involving a tort right—recognized either at common law or under State law. Instead, section 104(a)(2) extends also to those suits or actions which involve a legal right that is more analogous to a tort-type right than to any other legal category of rights. The Supreme

Court has declared that sec. 1983 "was intended to '[create] a species of tort liability'" (*Carey v. Piphus*, 435 U.S. at 253), and has held "that §1983 claims are best characterized as personal injury actions" (*Wilson v. Garcia*, 471 U.S. at 280.). We conclude that, under both the language of the statute and the interpretation of it that is provided by the regulation, gross income does not include damages received under a sec. 1983 claim based on violation of petitioner's First Amendment right to free speech.

On brief, respondent contends that—

Here the record indicates that the primary reasons for the dispute between the petitioner and the Board involved dissatisfaction by the Board with the petitioner's job performance. In other words, the basis of that controversy was essentially contractual in nature.

We do not so read the record in the instant case. Rather, we agree with the Chancery Court's focus on petitioner's extracurricular public statements. The board had successfully fought off any liability for any part of the original dispute that "was essentially contractual in nature" and nothing in the record shows an intent by the board to pay petitioner to settle issues that the board had already won.[10]

---

[10] On cross-examination, Eichelberger testified as follows:

[BENT:] Now, what was your basic motive—I'll go back to this point one time—what was your basic motive in settling the case, regardless of the amount involved? What were you trying to do for the school board?

[EICHELBERGER:] I don't understand what you mean by motive; what my only motive would be is to do my job. And if it looks like we investigate a case and it looks like it's one to settle, we settle it.

Q. Why did you feel that this case had to be settled?

A. Well, I think you're aware that it was tried once; and Chancellor Brown found partially in your favor.

Q. How did he find in my favor?

   &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

[A.] Chancellor Brown ruled that you were not to be reinstated, but that he felt that you were entitled to some monetary restitution.

   &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. For what purpose?

A. He thought—well, I—well, he thought that there had been a wrong.

Q. And what was that wrong?

A. Well, I think you'd have to ask Chancellor Brown from that point. We didn't particularly agree with that; I think our attorney filed an appeal on that decision; and the appeal, I think was still pending when we settled.

Q. But you did settle.

A. I think you're aware of that, yeah.

Q. Okay

After Chancellor Brown's decison.

A. Yes we did, yeah.

Respondent has introduced evidence concerning the negotiations between petitioner and the payor, INA. Eichelberger testified as to his recollection of the events. He explained to the Court the procedures of INA in suits involving its policyholders, with particular emphasis on the documents used by INA, including some of the documents contained in the file it maintained on petitioner's claim against the board. Furthermore, on brief, respondent stressed Eichelberger's testimony regarding the $24,000 settlement payment, which Eichelberger believed was for $12,000 in lieu of lost wages and $12,000 for petitioner's attorney fees.

It is abundantly clear that "lost earnings" is a proper element of compensatory damages that may be awarded under sec. 1983 in order to redress the party who has been injured by a deprivation of First Amendment rights under color of State law. See *Memphis Community School Dist. v. Stachura*, 477 U.S. ____ (1986) (a jury awarded damages to a secondary school teacher because the teacher's employer, a public school board, suspended the teacher from employment, in violation of his First Amendment rights). In the instant case, respondent directs us to evidence that INA considered petitioner's lost wages in settling petitioner's suit against the board, and would have us regard such evidence as pointing to a conclusion that the settlement was of an employment contract claim. However, consideration of a taxpayer's lost wages is appropriate in disposing of a sec. 1983 claim for redress of injuries resulting from violations of the First Amendment, as well as in disposing of an employment contract claim. It follows that this evidence is consistent with petitioner's case as well as with respondent's case.

---

Q. And though your attorney may have filed an appeal, if you settled you must have thought that that appeal did not have too much merit.

A. I wouldn't say that; we already had lost once, which is an indication that we had—the school district had a weakness in their defense.

Q. Okay; well, what was that weakness? You had to have a motive for paying money. You don't pay $24,000 without—

A. Well, I've said it before; Chancellor Brown gave an adverse decision.

Q. But what was the decision based on?

A. Well, I'll say it again; he thought—apparently he thought that there had been a wrong. You had been wronged; your civil rights had apparently been violated. And he said to make it—he felt that there should be a monetary reimbursement done to you—done—

Q. Then you basically paid the money to right that wrong.

A. Yeah.

MR. BENT: No more questions, Your Honor.

After examining the record, including the decision of the Chancery Court, we conclude that the element of lost wages was not an independent basis for recovery but only an evidentiary factor in determining the amount by which petitioner was damaged. See *Memphis Community School Dist. v. Stachura, supra; State Fish Corp. v. Commissioner*, 48 T.C. 465, 476-477 (1967); see also *Raytheon Production Corp. v. Commissioner*, 144 F.2d 110, 113-114 (1st Cir. 1944), affg. 1 T.C. 952 (1943).

We hold for petitioner on this issue.

## II. *Deduction of Legal Fee*

Section 265[11] precludes a deduction for the amount paid for legal fees if it is allocable to a class of income exempt from taxation. Thus, with the $24,000 settlement payment excludable from gross income, the $8,000 amount paid for legal fees is not deductible. *Church v. Commissioner*, 80 T.C. at 1110-1111; see also *Deason v. Commissioner*, 41 T.C. 465, 467-468 (1964).

We hold for respondent on this issue.

*Decision will be entered under Rule 155.*

---

[11] Sec. 265 provides, in relevant part, as follows:

SEC. 265. EXPENSES AND INTEREST RELATING TO TAX-EXEMPT INCOME.

No deduction shall be allowed for—

   (1) EXPENSES.—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this subtitle, or any amount otherwise allowable under sec. 212 (relating to expenses for production of income) which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this subtitle.