MARIA Z. MATRAY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Matray v. Commissioner
Docket No. 15018-86.
United States Tax Court
T.C. Memo 1989-28; 1989 Tax Ct. Memo LEXIS 27; 56 T.C.M. (CCH) 1107; T.C.M. (RIA) 89028; January 12, 1989. Frederick N. Widen, for the petitioner. Steven M. Walk, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice of deficiency dated February 27, 1986, determined a deficiency in petitioner's and her husband's joint 1979 income taxes of $ 124,399.04. After concessions, including those made on brief, we must determine: (1) Whether any part of certain settlement proceeds petitioner and her husband received are excludable under section 104(a)(2); *29 [1] and (2) the holding period of a partnership interest sold by petitioner's husband in connection with the settlement transaction. FINDINGS OF FACT Petitioner, Maria Z. Matray, resided in Highland Heights, Ohio, when her petition was filed in this case. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner and her husband, Michael M. Matray (Matray), filed a joint income tax return for taxable year 1979. Although the notice of deficiency was sent to both petitioner and Matray, petitioner is the only party to this action. Matray sold, syndicated and managed real estate from 1970 through 1986. As such, Matray would from time to time approach various people to invest their money in real estate limited partnerships from which he would derive commission and syndication fees, as well as continuing management fees for managing the real estate. Herbert Sternheimer (Sternheimer), a business associate of Matray, assisted Matray in managing the properties and also held proprietary interests in the real estate ventures. *30 Matray disposed of and terminated his (and petitioner's) interests in three of such properties, the tax consequences of which are the subject matter of this case. Westview Associates, Ltd. (Westview), an Ohio limited partnership, was formed in May 1976. Matray was one of six original general partners of Westview. Westview was formed to acquire, own, lease, operate and sell a 449 suite apartment complex located in Parma, Ohio, known as Westview Acres Apartments. Westview purchased the apartments in 1976 for $ 3,710,000, financed with $ 2,750,000 first mortgage from Women's Federal Savings (Women's Federal) and $ 600,000 purchase money mortgage from Grant Realty. Matray managed the apartments and received as compensation a management fee of 5 percent of gross rents. Matray received the management fee pursuant to a contract with Westview that initially provided he would be the manager for life. Upon his death, petitioner would manage the property for her life. Matray's duties were to collect rent, pay expenses, pay contractors, rent apartment units and maintain the property. Matray incurred unreimbursed expenses in managing the properties. Matray was also a general partner *31 in a limited partnership known as Bonneville Towers, Ltd. (Bonneville Ltd.), which acquired, owned and operated a 120 suite apartment building located in Euclid, Ohio, starting in 1975. Matray had a management contract with Bonneville Ltd. similar to the Westview contract, providing for a 5-percent management fee so long as Matray (and petitioner) lived or the partnership was in existence. The controversy generating this case originated in 1978. In that year, two brothers, Charles Ianni and Joseph Ianni (Iannis), became interested in properties that Matray had syndicated. The Iannis negotiated with Westview to purchase Westview Acres Apartments. Westview and the Iannis' were unable to consummate the sale primarily because Women's Federal was unwilling to permit the transfer of Westview Acres without receiving an increased rate of interest. On December 1, 1978, the Iannis agreed to purchase the general and limited partnership interests in Westview in lieu of purchasing the fee of Westview Acres Apartments. However, Matray and some of the other partners wanted to continue on as partners. They were able to do so, but the details of the transaction are not clear. Prior to the agreement, *32 Matray's interest in Westview's operating profits and losses was either 5 or 7-1/2 percent, and his interest in the sale of Westview Acres Apartments was between 5 and 15 percent. After the agreement, Matray held a limited partnership interest of approximately 25 percent of profits and losses and gain on a sale of the apartments. Bonneville Towers, Inc. (Bonneville Inc.), an Ohio corporation, was formed in early 1979 to acquire the apartment building owned by Bonneville Ltd. and convert it into a condominium. In lieu of receiving a $ 25,000 real estate commission on the sale of the building from Bonneville Ltd. to Bonneville Inc., Matray received 90 shares of stock in Bonneville Inc. Sternheimer received 30 shares and the Iannis received 140 shares. Matray was president of Bonneville Inc. When Bonneville Ltd. sold the building to Bonneville Inc., Matray entered into a new management contract under which Matray would continue to manage the building, but only for 5 years or until the apartments were sold to condominium purchasers. SSMG, Inc. (SSMG), was formed in 1978 to subdivide and sell home sites on a 300 acre parcel of land. Petitioner was the owner of 70 shares of SSMG. *33 Elaine Sternheimer held 20 shares, and interests related or friendly to the Iannis held 110 shares. Matray was president of SSMG. Early in 1979, John Terlep (Terlep), an architect and close friend of the Iannis, asked Matray to permit him to participate in the management of Bonneville and Westview and to share one-half of the management fees. Matray turned down such arrangement, which apparently resulted in Terlep representing to the Iannis that Matray was poorly managing the properties. Shortly thereafter, the relationship between Matray and the Iannis deteriorated. The Iannis began contacting Matray's friends and investors and told them that Matray was mismanaging the properties, and that Matray was a poor real estate developer. Matray's health was adversely affected. The Iannis then attempted to take control of SSMG, Westview and Bonneville Inc. As a consequence of the disagreement over managing the properties, Matray retained Nicholas Devito (Devito), an attorney specializing in personal injury, medical malpractice, contract and real estate litigation. Upon reviewing the documents pertaining to the SSMG, Westview and Bonneville real estate ventures, Devito contacted *34 several of the investors in such ventures and solicited and obtained proxies from them. These proxies prevented the Iannis from taking control of Bonneville, Westview or SSMG. When the Iannis realized they could not force Matray out they began serious negotiations with Matray and Sternheimer, who also held interests in the properties. Devito represented both Matray and Sternheimer in the negotiations. By written agreement (Agreement) dated June 1, 1979, the parties recognized that "Certain controversies have arisen * * * concerning the quality, manner and extent of control, operation and management of the properties * * *" and resolved their dispute. Per the Agreement, the Iannis purchased the following ownership interests from Matray and Sternheimer: Westview Associates, Ltd.
Herbert Sternheimer
8.634 percent
Michael A. Matray
25.901 percent
Bonneville Towers, Inc.
Michael A. Matray
90 shares
Herbert Sternheimer
30 shares
SSMG, Inc.
Maria Matray
70 shares
Elaine Sternheimer
20 shares
The Iannis' agreed to pay Matray and Sternheimer $ 400,000, $ 100,000 allocated to the purchase of the stock and partnership interests and $ 300,000 "to be in settlement *35 of all claims and causes of action or controversies * * * relating to personal injury, termination of employment and damage to business reputation." (Emphasis added.) Matray and Sternheimer agreed to the "termination and release of any and all management contracts, broker's contracts for sales commissions, consulting agreements, employment agreements or any other contract or arrangement * * *." (Emphasis added.) Matray and Sternheimer were engaged as sales agents for the sale of lots for SSMG. Under the Agreement, Matray's and petitioner's share of the proceeds was $ 300,000. They paid Devito $ 30,000 in legal fees relating to the Agreement, for net proceeds of $ 270,000. Of the $ 300,000 amount, $ 75,726.16 is allocable to the stock and partnership interests and $ 224,273.84 is allocable to the other settled claims. The legal fees are allocable $ 7,752.62 to the stock and partnership interests and $ 22,427.38 to other claim settlements. On their return for 1979, petitioner and Matray erroneously allocated $ 100,000 of the proceeds to the stock and partnership interests. Prior to the Agreement, Matray derived his living from real estate management fees and real estate *36 commissions. Subsequent to the Agreement, as a result of the Iannis' disparaging remarks to investors, Matray's income from management fees dropped drastically. Matray's sole sources of income after the Agreement were interest income and management fees from River Ridge (an unrelated property). Matray received the following amounts from 1976 to 1979 pursuant to his arrangements with the different syndications involved in this case. Year
Item
Amount
1976
Westview -- Finders Fees
$ 40,000.00
Westview -- Management Fees
10,857.09
Westview -- Commissions
18,444.44
Bonneville Ltd. -- Management Fees
17,815.71
1977
Westview -- Management Fees
$  7,629.00
Bonneville Ltd. -- Management Fees
15,496.22
1978
Westview -- Management Fees
$  9,857.28
Westview -- Commissions
69,000.00
Bonneville Ltd. -- Management Fees
7,621.41
SSMG -- Commissions
5,573.45
1979
Bonneville Ltd. -- Commissions
$ 25,000.00
SSMG -- Commissions
10,000.00
Bonneville Inc./Westview --
10,107.12
Management Fees
OPINION The issues in this case involve the tax treatment of the settlement between petitioner and her husband, Matray, and *37 the Iannis. Petitioner, ultimately, has the burden of proof with respect to the exclusion and characterization issues. Initially, we consider if any part of the settlement proceeds should be excluded from gross income under section 104(a)(2). While both parties agree that the $ 75,000 attributable to petitioner's and Matray's ownership interests is not excludable, approximately $ 224,000 paid in settlement of other claims remains in dispute. Section 61 includes in gross income all income from whatever source derived. However, section 104(a)(2) provides that the amount of damages received (whether by suit or agreement) on account of personal injuries or sickness is not included in gross income. The damages referred to are based upon tort or tort-type rights. Sec. 1.104-1(c), Income Tax Regs.
To determine excludability under section 104(a)(2), we must look at the origin and character of the claim. Thompson v. Commissioner,89 T.C. 632 (1987); Threlkeld v. Commissioner,87 T.C. 1294 (1986), *38 affd. 848 F.2d 81 (6th Cir. 1988); Bent v. Commissioner,87 T.C. 236 (1986), affd. 835 F.2d 67 (3d Cir. 1987); Glynn v. Commissioner,76 T.C. 116 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982); Seay v. Commissioner,58 T.C. 32 (1972). Petitioner argues that the amounts received in settlement of claims were all damages for personal injury, referencing the Agreement and Matray's testimony at trial regarding his ill health. Respondent argues the same amounts were ordinary income, representing damages for cancellation of lucrative management and commission contracts. We do not fully agree with either party. We generally look to the express terms of a settlement agreement to determine the origin and allocation of settlement proceeds. Metzger v. Commissioner,88 T.C. 834 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); Fono v. Commissioner,79 T.C. 680 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984). *39 The Agreement expressly makes the payment in settlement of all claims relating to personal injury, termination of employment and damage to business reputation. However, the Agreement makes no numerical allocation as to the three different bases for settlement. Therefore, we must make the allocation based on evidence in the record, bearing in mind that petitioner has the burden of proof. To some extent, the settlement was attributable to personal injuries and damage to business reputation. The Agreement expressly provides some portion of the settlement is so attributable. Moreover, we believe Matray's testimony that his health was adversely affected, and that his business was adversely affected by the Iannis' representations to investors concerning his management ability. Matray's only income after the Agreement was interest and management fees from an unrelated property. Damages for personal injury, including damage to business reputation, are excludable under section 104(a)(2). Threlkeld v. Commissioner, supra;Roemer v. Commissioner,716 F.2d 693 (9th Cir. 1983), *40 revg. 79 T.C. 398 (1982). To the extent we can determine the amount of damages attributable to "termination of employment," then, the remainder will be excludable. In considering the "termination of employment" clause, we find it refers to the termination and release of the management and broker contracts. The central dispute between the Iannis and Matray involved management of the buildings. The major goal of the Iannis was to remove Matray and replace him with Terlep. Moreover, the prelude to the Agreement expressly mentions management of the properties as a central controversy. Therefore, we conclude that the parties were referring to the management and broker contracts collectively as "employment." Our conclusion is further supported by the absence in the record of any "employment" contracts. Petitioner argues that the termination of employment clause refers to Sternheimer only. The record, however, does not support the proposition that Sternheimer was an employee of Matray or any of the entities involved. We believe that the term "employment" was used in a general sense, not specifically referring to any common law employer-employee relationships. *41 Payments for terminating and canceling employment contracts are not payments for personal injuries. Knuckles v. Commissioner,349 F.2d 610 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Glynn v. Commissioner, supra. See also Thompson v. Commissioner, supra.Analogously, recoveries based on the management and broker contracts are rooted in contract, and not tort-type rights, and are thus not excludable under section 104(a)(2). After considering all the evidence in the record, we find that $ 100,000 of the settlement proceeds was allocable to the termination of the management contracts. We also attribute $ 15,000 to the broker contracts. Although this may be somewhat low, we believe the majority of sales commissions had already been earned after the sales to the Iannis. Nothing has been attributed to the SSMG contracts, because Matray and Sternheimer were retained as agents under the Agreement. Thus, we find that $ 115,000 of the settlement originated in essentially contractual claims, and is therefore not excludable. The *42 remainder, $ 109,273.84, is attributable to personal injuries and excludable under section 104(a)(2). A proportionate amount of the approximate $ 24,000 legal fee must be attributed to each component of the settlement. Petitioner next argues that the portion includable in gross income ($ 115,000) should be capital gain and not ordinary income. Since the income portion of the settlement was attributable to terminated management and broker contracts, the payments thereunder were substitutes for ordinary income, not capital in nature. Flower v. Commissioner,61 T.C. 140 (1973), affd. by unpublished order 505 F.2d 1302 (5th Cir. 1975). The final issue is the holding period for Matray's partnership interest in Westview. While Matray held his limited partnership interest for less than one year, petitioner argues that the holding period should be tacked to that of Matray's general partnership interest under section 1223. Section 1223(1) provides that the holding period of property received in an exchange includes the holding period of the property exchanged *43 if the property received has the same basis (in whole or in part) as the property exchanged. Petitioner argues that the initial sales to the Iannis of more than 50 percent of the partnership interests caused a termination under section 708(b), triggering a pro rata distribution to Matray and recontribution, in which basis would eventually be determined with reference to the basis in the general partnership interest. See secs. 708(b)(1)(B), 732(b), 722, 1.708-1(b)(1)(iv), Income Tax Regs. Petitioner also cites Revenue Ruling 84-52, 1984-1 C.B. 157, for the proposition that the holding period is tacked when general partnership interests are converted into limited partnership interests. Respondent argues that the record is too sparse to tell what occurred when Matray exchanged his general partnership interest for a limited partnership interest. We agree with respondent. Matray started out with between 5 and 7-1/2 percent interest in profits and losses. We cannot determine the percentage because no executed partnership agreement is in evidence, and the partnership K-1's (5 percent) conflict with Matray's testimony (7-1/2 percent). There is also a closing agreement in *44 evidence, referencing the Iannis' agreement to purchase all of the partnership interests in Westview, but the purchase agreement itself is not in evidence. After the purchase, Matray ended up with a 25-percent interest in profits and losses. Due to this lack of documentation, we cannot determine with any acuity what actually transpired. Petitioner argues that Matray elected not to sell his partnership interest, and merely converted the general partnership interest to a limited partnership interest. However, we are not convinced that something else did not occur. This is primarily due to the changing interests in profits and losses before and after the transaction, which makes petitioner's statutory, regulatory and ruling references inapposite. We are willing to accept, although there is some doubt, that more than 50 percent of the interests in Westview were sold, thus terminating the partnership under section 708(b)(1)(B). Under the regulations, this caused a deemed distribution in liquidation, followed by a recontribution to the "new" partnership of the assets distributed. Secs. 731, 721, 1.708-1(b)(1)(iv), Income Tax Regs. If this was all that occurred, we do not see how *45 Matray would have been entitled to a 25 percent, rather than a 5 percent, interest in the partnership. The statutory provisions cited by petitioner cannot explain or justify the increase in Matray's interest. Similar considerations exist with Revenue Ruling 84-15, supra, cited by petitioner. In that ruling, a general partnership with four partners was converted to a limited partnership, with each of the partners retaining the same interest in profits and losses. Under section 721, the conversion was treated as contribution of the general partnership interest in exchange for the limited partnership interest, with concomitant tacking of holding period because the basis of the limited partnership interest was determined with reference to the general partnership interest contributed. Secs. 722, 1223(1). One of the underlying assumptions in that Revenue Ruling was that the interests in profits and losses stayed the same throughout the conversion transaction. We are unable to say that the transaction at issue here was the simple conversion transaction that petitioner wants it to appear. Cf. Colonnade Condominium, Inc. v. Commissioner,91 T.C. 793 (1988), *46 where the acquisition of partnership interests was held a sale or exchange and not the admission of new partners by contribution. One of the factors in our decision was that in a contribution transaction the interests of all the partners would be proportionately reduced, whereas there the interests of only one partner was diminished. Thus, petitioner has not established that the holding period of Matray's limited partnership interest in Westview can be tacked, under section 1223(1), to Matray's holding period for his general partnership interest. Thus, the gain on the sale of the limited partnership interest is short-term capital gain. To reflect the foregoing and concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year at issue.↩