JAMES M. DURRETT, JR. AND NORMA L. DURRETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Durrett
Docket No. 8786-90
United States Tax Court
T.C. Memo 1992-682; 1992 Tax Ct. Memo LEXIS 724; 64 T.C.M. (CCH) 1401; November 30, 1992, Filed *724 Decision will be entered for respondent. For Petitioners: Kendall O. Schlenker. For Respondent: Thomas F. Eagan. COUVILLION
COUVILLION
MEMORANDUM OPINION COUVILLION, Special Trial Judge: This case was heard pursuant to section 7443A(b)(3) [1] and Rules 180, 181, and 182. Respondent determined a deficiency in petitioners' 1986 Federal income tax in the amount of $ 3,300.52 and additions to tax under section 6653(a)(1)(A) of $ 165.03 and section 6653(a)(1)(B) of 50 percent of the interest payable on that portion of the underpayment attributable to negligence or disregard of rules or regulations. The issues for decision are: (1) Whether $ 18,231 received by James M. Durrett, Jr. (petitioner), from the University of New Mexico during 1986 in settlement of a grievance claim is excludable from petitioner's gross income under section 104(a)(2), and (2) *725 whether petitioners are liable for the additions to tax. Some of the facts were stipulated and are found accordingly. The stipulation and attached exhibits are incorporated by reference. Petitioners, husband and wife, resided in Albuquerque, New Mexico, at the time they filed their petition. In July 1983, after having practiced law for over 20 years, petitioner was appointed assistant university counsel for the University of New Mexico (the University). Petitioner, as an in-house attorney, represented and advised the University's Board of Regents, administration, faculty, and staff and assisted the university counsel, D. Peter Rask (Mr. Rask). Petitioner's employment was governed by the University's Personnel Policies & Practice Manual and by its Staff Employee Handbook. Since there was no written employment contract between petitioner and the University, these documents served as the contractual basis of petitioner's relationship with the University. In accordance with University policy, after successfully completing a 6-month probationary period, petitioner became a regular university employee on January 11, 1984. Policy 215 in the Personnel Policies & Practice Manual stated *726 that the University retained the right "to suspend, demote, discharge, or take other disciplinary action against employees for proper cause" and "to relieve employees from duties because of lack of work or for other legitimate reasons". The standards and procedures to be followed by University officials in the discipline or discharge of regular employees were also set out in that manual. These procedures differed from those applicable to probationary employees who could "be terminated at any time prior to completion of the probationary period". Petitioner's job performance was routinely evaluated at the end of his probationary period and thereafter in November 1984 and July 1985 by Mr. Rask. The evaluator rated an employee's performance on a scale of 1 to 5, based on various factors. Petitioner received favorable ratings on all three evaluations. On January 1, 1985, the University Board of Regents appointed a new president of the University, who in turn appointed a Mr. Goldberg as university counsel. Mr. Goldberg replaced Mr. Rask, who left the University several months later. In November 1985, Mr. Goldberg orally requested petitioner's resignation as assistant University *727 counsel for the reason that Mr. Goldberg was not pleased with petitioner's performance. At trial, petitioner testified to his reaction at the time: Well, fine, Joe. We never discussed anything other than he wanted my resignation. And he said, Well, when are you going to give it to me? And I said, Well, I don't know. As soon as I can find another job. I will start looking. And I said, I have been kind of looking because things have been a little shaky around here. I knew there was trouble between the Board of Regents and the president. But I will continue looking and as soon as I can find something, I will leave. On December 19, 1985, Mr. Goldberg again insisted that petitioner set a date for his resignation, which Mr. Goldberg required be no later than January 31, 1986. On December 20, 1985, petitioner sent a memorandum to Mr. Goldberg advising that he was actively seeking other employment, that he would "cooperate in every way possible", but that he was unable to "set an arbitrary date" such as January 31, 1986, for his resignation. Petitioner felt it would take him at least 6 months to a year to find comparable employment. Petitioner testified that, sometime during *728 the following two weeks while on annual and holiday leave, he placed a call to the president of the Board of Regents, Jerry Apodaca, seeking advice about his employment situation. Petitioner told Mr. Apodaca that he did not want to resign because he liked his job, but that he also did not want to cause a lot of trouble. The advice petitioner received prompted a second memorandum to Mr. Goldberg on January 2, 1986, seeking written reasons for requesting petitioner's resignation. The following day, Mr. Goldberg replied with a lengthy, detailed letter describing particular incidents and areas in which he felt petitioner's work was deficient. It was also made clear to petitioner that action was being taken to terminate his employment with the University effective January 20, 1986. Mr. Goldberg stated in this letter that petitioner was entitled, under the University's personnel policies, to a hearing on the termination action and that a meeting could be arranged to give petitioner an opportunity to rebut and discuss the matter. Neither this letter nor any criticism of petitioner's performance was ever made public. On January 8, 1986, petitioner filed a grievance memorandum "pursuant *729 to Policy 220 of the Personnel Policies and Practices Manual" with the University's director of personnel. Petitioner's grievance was the "wrongful termination" of his employment. Petitioner prepared the grievance himself and intended it to form the complaint upon which his remedy from the University would be based. The remainder of the memorandum read: The facts upon which this grievance is based are as follows: a. On January 3, 1986, I was handed a letter from University Counsel Joseph Goldberg stating that my employment would be terminated on January 20, 1986. A copy of this letter is attached. b. The statements contained in the January 3, 1986 letter are incorrect or explainable and I was not given an opportunity to discuss or explain any of the matters prior to delivery of the termination notice. The facts stated above constitute a discharge without proper cause in violation of University policy set out in Policy 215 and Policy 225 of the Personnel Policies and Practices Manual. The remedy sought is reinstatement of my position with full back-pay and benefits in the event that any working time is lost as a result of this termination. Petitioner met with Mr. Goldberg *730 on January 13, 1986, and verbally responded to the allegations previously made. A conference was scheduled for January 16, 1986, to be attended by petitioner, Mr. Goldberg, and the director of personnel in order to address petitioner's grievance. Immediately before the conference, Mr. Goldberg handed petitioner a letter stating that he would not withdraw the action to terminate petitioner's employment. At the conference, a settlement was reached between the parties which resulted in a lump-sum payment to petitioner in the amount of $ 18,231. A "Memo of Understanding for Settlement of Grievance" was prepared by the University's employee relations manager on February 3, 1986, and signed by Mr. Goldberg and petitioner. The following stipulations constituted the entire agreement between the parties: (1) Petitioner's termination was changed to resignation effective January 20, 1986. (2) All communications regarding petitioner's termination were removed from his personnel file and held in a confidential grievance file. (3) University counsel was instructed to forward all employment inquiries to Mr. Rask. (4) Petitioner received the lump-sum amount as "full financial settlement *731 and no payment of any other benefits" would be made. (5) Petitioner would not pursue the grievance on any other format and the matter would be considered closed. The University issued a check to petitioner on February 14, 1986, for $ 18,231. This amount was equal to one-half of petitioner's annual compensation with the University. Petitioner thereafter received a Form 1099-MISC from the University reporting this amount as nonemployee compensation for 1986. In the preparation of his 1986 income tax return, petitioner did not include the $ 18,231 in income. Based on the information return filed by the University, respondent determined that the $ 18,231 constituted taxable income. The determinations by respondent in a notice of deficiency are presumed correct, and the burden of proof is on the taxpayer to prove that the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent contends that the $ 18,231 settlement petitioner received from the University was intended to settle a claim involving the breach of an employment contract and was paid in exchange for petitioner's resignation. Thus, the amount is includable *732 in gross income. Petitioner contends that the payment was for claims more "tort-like than contract-like", and that, therefore, the payment is excludable under section 104(a)(2). Section 61(a) states that, except as otherwise provided, gross income means "all income from whatever source derived". Section 104(a)(2) provides otherwise, in that it excludes from gross income damages received on account of personal injuries or sickness. The Internal Revenue Code of 1954 does not explain what a taxpayer must show in order to prove that the damages were received "on account of personal injuries". Stocks v. Commissioner, 98 T.C. 1, 8-9 (1992); Seay v. Commissioner, 58 T.C. 32, 36 (1972). However, it is well established the term "personal injuries" in section 104(a)(2) includes nonphysical as well as physical injuries. See United States v. Burke, 504 U.S.    , 112 S. Ct. 1867, 1871-1872 n.6 (1992); Threlkeld v. Commissioner, 848 F.2d 81, 84 (6th Cir. 1988), affg. 87 T.C. 1294, 1308 (1986); Bent v. Commissioner, 87 T.C. 236, 244 (1986), *733 affd. 835 F.2d 67, 69-71 (3d Cir. 1987). Section 1.104-1(c), Income Tax Regs., provides that "The term 'damages received (whether by suit or agreement)' means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Therefore, section 104(a)(2) excludes only damages received on account of the prosecution or settlement of tort or tort-type claims, not damages received on account of the prosecution or settlement of economic rights arising out of a contract. Downey v. Commissioner, 97 T.C. 150, 160 (1991); Metzger v. Commissioner, 88 T.C. 834, 848-850 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988). Section 104(a)(2) provides for the exclusion of damages received through a settlement agreement, as well as through a suit. Metzger v. Commissioner, supra at 847. In this case, petitioner received $ 18,231 through a settlement agreement. Where a settlement agreement *734 exists, determining the exclusion for tax purposes depends on the nature of the claim that was the actual basis for settlement rather than the validity of the claim. Stocks v. Commissioner, supra at 10. The settlement agreement between petitioner and the University contains no express language that the payment in question was made on account of a personal injury or tort or tort-type rights. The exact language of the agreement read: 4. Mr. Durrett will receive a sum of $ 18,231.00. This will constitute full financial settlement and no payment of any other benefits will be made. 5. Mr. Durrett will not pursue this grievance on any other format and this matter will be considered closed. At the beginning of the agreement, the document was captioned "Re: J. M. Durrett, Jr., Unjust Termination." If the settlement agreement lacks express language stating what the settlement amount was paid to settle, then the most important factor in determining any exclusion under section 104(a)(2) is the "intent of the payor" as to the purpose in making the payment. Knuckles v. Commissioner, 349 F.2d 610, 612 (10th Cir. 1965), *735 affg. T.C. Memo. 1964-33; Metzger v. Commissioner, supra at 847-848; Glynn v. Commissioner, 76 T.C. 116, 120 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982). Such an intent is factually grounded and must be discerned from an inquiry into all the facts and circumstances surrounding the actual payment. Seay v. Commissioner, supra at 37; Madson v. Commissioner, T.C. Memo. 1988-325. Petitioner at all times claimed that Mr. Goldberg's actions in terminating his employment were taken without proper cause and without following the proper procedures set out in the University's Personnel Policies & Practices Manual. In Forrester v. Parker, 606 P.2d 191 (N.M. 1980), the New Mexico Supreme Court held that, based on the words and conduct of the parties, the personnel policy guide constituted an implied employment contract governing the employment relationship. Neither petitioner nor respondent disputed the existence of such a contract between petitioner *736 and the University. Petitioner admitted that the grievance he filed did not allege any personal injury, that he did not seek any pecuniary amount in damages, and that he only sought continued employment with the University. In fact, his grievance memorandum stated expressly "The remedy sought is reinstatement of my position with full back-pay and benefits in the event that any working time is lost as a result of this termination." These factors are all indicative of a claim contractual in nature. Glynn v. Commissioner, supra; Nussbaum v. Commissioner, T.C. Memo. 1982-725; Boudar v. E.G. & G., Inc., 742 P.2d 491 (N.M. 1987). Nevertheless, petitioner argues that his grievance did not state all of his possible claims against the University, and that there were additional "tort or tort-type" claims. For example, petitioner argues that any action by him against the University "would have been based" upon a "mixed theory of recovery in tort and contract" and "would also have been based on" a constitutional violation of petitioner's right to due process. Petitioner also cited a number of *737 cases addressing the validity of these, and other, possible claims. The Court finds that these arguments are misplaced. The question that ultimately must be answered is what claims did the payer intend to settle at the time the payment was made and not what claims petitioner might have brought in a hypothetical legal action. In a case where the intent of the payer had to be discerned, Stocks v. Commissioner, supra, this Court concluded that the payment received by an employee in settlement of a dispute with her employer was intended to settle a potential breach of contract claim as well as a potential racial discrimination claim; [2] thus, the damage award was allocated accordingly. That case is distinguishable from this case because the employee in the Stocks case did not use the administrative grievance process but had filed two civil rights complaints with the U. S. Equal Employment Opportunity Commission. Therefore, the taxpayer's employer had knowledge of those claims and, in fact, testified that the settlement would not have been the same unless those civil rights claims were released.
*738 The Court finds no evidence in this case that the University intended to settle any claim of petitioner based upon "tort or tort-type" rights or personal injury claims, such as emotional distress or harm to reputation, or that the University had knowledge of any such claims that petitioner intended to pursue. The language on the face of the grievance and settlement documents sets forth a claim contractual in nature, and petitioner's testimony does not persuade the Court to find otherwise. The settlement was not made pursuant to any past or pending legal action. It appears that the settlement was intended to compensate petitioner only for lost wages, namely, one-half of his annual salary from the University. There is no evidence that petitioner, in negotiating the termination settlement, asserted any claim or argument based upon tort or tort-type rights, or received any part of the settlement as compensation for such a claim. Therefore, the Court finds that petitioners failed to meet their burden of proof. Respondent is sustained on this issue. See United States v. Burke, supra.
Respondent also determined petitioners were liable for the additions *739 to tax for negligence under section 6653(a)(1)(A) and (B) for 1986. Section 6653(a)(1)(A) provides that, if any part of an underpayment of income tax is due to negligence or disregard of rules or regulations, there shall be added to the tax an amount equal to the sum of 5 percent of the underpayment. Under section 6653(a)(1)(B), an additional amount is due equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence or disregard of rules or regulations. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The Commissioner's determination is presumptively correct and will be upheld unless the taxpayers are able to rebut the presumption by showing they used due care. See Reily v. Commissioner, 53 T.C. 8 (1969). Under section 6653(g), if any amount is shown on an information return, and the payee or other person with respect to whom the return is made fails to properly show such amount on his or her return, *740 any portion of an underpayment attributable to such failure shall be treated as due to negligence in the absence of clear and convincing evidence to the contrary. In the preparation of his 1986 income tax return, petitioner failed to report the $ 18,231 which was properly includable in gross income. Petitioner received from the University of New Mexico Form 1099-MISC reporting the total amount as nonemployee compensation and knew this information had been reported to respondent. Petitioner testified that, prior to his conference with the University which resulted in the settlement, he consulted with attorneys who specialized in employment and civil rights law. He was advised that a recovery for violation of his civil rights would not constitute taxable income. These attorneys also expressed their opinion that it appeared to them that petitioner had a civil rights claim. However, these attorneys did not represent petitioner in the settlement with the University nor did petitioner consult with these attorneys after the settlement was completed. Petitioner sought no other legal advice. As noted earlier, the record is barren of any claim or semblance of a claim by petitioner for *741 personal injuries, including a claim for violation of petitioner's civil rights. Petitioner's belief that he had a valid civil rights claim, even though no such claim was ever asserted, was the basis upon which he failed to report the $ 18,231 on his income tax return. Such a belief, standing alone, does not prove by clear and convincing evidence that petitioner used due care in the preparation of his return. Therefore, the Court must hold for respondent on the additions to tax issue. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Injuries resulting from racial discrimination are personal injuries for purposes of sec. 104(a)(2). See Stocks v. Commissioner, 98 T.C. 1, 9↩ (1992).