T.C. Memo. 1997-113


UNITED STATES TAX COURT


WALLACE R. NOEL AND ROBINETTE NOEL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18000-94.                    Filed March 5, 1997.


        P owned stock in Corp. A.  Corp. A operated numerous
   restaurants under a franchise arrangement with Corp. B.  P
   sued both Corp. A and Corp. B, alleging two contract claims
   and a tort claim.  Corp. B and P entered into a settlement
   agreement, whereby Corp. B purchased P's stock in Corp. A
   and, in return, P released his claims against Corp. B.  P
   used some of the proceeds received as a result of the
   agreement with Corp. B to settle a loan made to P by Bank X.
   The loan balance consisted of both principal and accrued
   interest.  P also wrote off an investment in Company Y.
        <u>Held</u>:  $295,461 of the proceeds P received from Corp. B
   is excludable under sec. 104(a)(2).
        <u>Held, further</u>:  Except for $219,000 of the fees that P
   paid to his lawyers, P failed to substantiate his additions
   to basis in Corp. A stock.

_Held, further_:  P failed to substantiate a part of his basis in Company Y.

_Held, further_:  R's calculation of the interest portion on the loan from Bank X is sustained.

_Held, further_:  P failed to substantiate $19,975 of attorney's fees.

_Held, further_:  P is not liable for the accuracy-related penalty under sec. 6662(a).

_David M. Berrett_, for petitioners.

_William R. Davis, Jr._, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FAY, _Judge_:  Respondent determined deficiencies in petitioners' Federal income taxes and penalties as follows:

| Year | Deficiency | Penalty Sec. 6663[1] |
|------|------------|----------------------|
| 1990 | $815,589 | $611,692 |
| 1991 | 1,069 | 802 |

[1] Prior to trial, respondent conceded that no amounts were due to fraud.  In her answer to the petition, respondent asserted an accuracy-related penalty against petitioners pursuant to sec. 6662(a).

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

A trial was held to resolve the following issues for decision:

(1) Whether any of the amount received from PepsiCo, Inc. (PepsiCo), on the sale of petitioner's[1] stock in Pizza Management, Inc., is excludable from petitioners' income under section 104(a)(2). We hold that $295,461 is excludable.

(2) Whether legal fees and other expenses should have been included in the basis of petitioner's stock in Pizza Management, Inc., sold in 1990. We hold that $219,000 of the fees should have been so included.

(3) Whether petitioner substantiated amounts included in the basis of his failed investment in a T.J. Cinnamons Bakery franchise. We hold that the amounts have not been substantiated.

(4) Whether petitioners are entitled to deduct the investment interest expense claimed on their 1990 Federal income tax return related to loans from the United Bank of Fort Collins (the bank). We hold that they are, in the amounts set out herein.

(5) Whether 1991 deductions claimed for attorney's fees have been substantiated by petitioners. We hold that the fees have not been substantiated.

(6) Whether petitioners are subject to the accuracy-related penalty under section 6662(a) in connection with the filing of their 1990 and 1991 Federal income tax returns. We hold that they are not.

_____

[1]All references to petitioner are to Wallace R. Noel.

- 4 -

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, petitioners resided in Fort Collins, Colorado. At all times relevant, petitioners used the cash receipts and disbursements method of accounting.

Investment in Pizza Management, Inc.

In the 1960's and early 1970's, petitioner owned a number of Pizza Hut, Inc. (Pizza Hut), restaurants as a sole proprietor under a franchise arrangement between petitioner and Pizza Hut. In 1975, petitioner was approached by several other individual Pizza Hut franchisees who had formed a corporation called Pizza Management, Inc. (PMI). Petitioner transferred his restaurants to PMI in exchange for stock in the PMI corporation. Petitioner believed that PMI had a special contractual right to issue its shares to the public notwithstanding any terms or limitations of the Pizza Hut franchise agreements. As a result of petitioner's transferring his restaurants to PMI, petitioner received approximately 11 percent of the stock in PMI. By the mid-1980's, PMI was the franchisee of approximately 200 Pizza Hut restaurants.

In the spring of 1986, PMI developed plans for a public offering of PMI stock. Pizza Hut successfully prevented PMI from issuing shares in PMI to the public. Pizza Hut asserted that a

public offering of PMI stock would violate the terms of the franchise agreements between Pizza Hut and PMI.

PepsiCo's actions[2] in preventing the public offering adversely affected the value of petitioner's PMI stock. Also, petitioner suffered personal emotional distress as a consequence of PepsiCo's actions. Further, the damages to petitioner's business reputation caused by PepsiCo resulted in petitioner's suffering personal financial setbacks in ventures unrelated to his investment in PMI.

In May 1988, petitioner, as a shareholder of PMI, and his children, as shareholders of PMI, brought a civil action against PepsiCo,Pizza Hut, PMI, and other PMI shareholders. Petitioner alleged that he suffered damages as a result of Pizza Hut's refusal to allow the public offering to go forward. Specifically, petitioner made three claims against Pizza Hut and PepsiCo. First, petitioner alleged that PMI and PepsiCo had entered into agreements, after petitioner had transferred his sole proprietorship restaurants to PMI, which restricted PMI's right to "go public" and that the agreements between PepsiCo and PMI constituted a breach of obligations owed to petitioner as a third-party beneficiary under the original agreements between Pizza Hut and PMI. Second, petitioner urged that Pizza Hut be

---

[2]By the spring of 1986, PepsiCo had purchased all of the stock of Pizza Hut, and Pizza Hut became a wholly owned subsidiary of PepsiCo.

estopped from claiming that the PMI shareholders' rights had been modified by the later agreements between PMI and PepsiCo. Finally, petitioner alleged that the conduct by Pizza Hut in preventing the public offering constituted a tortious interference with petitioner's contractual rights and prospective business advantages.

In 1990, petitioner and Lawrence F. Dickie, a representative of PepsiCo, entered into settlement negotiations, resulting in an agreement whereby PepsiCo would acquire all of petitioner's PMI stock, and petitioner would release his claims against PepsiCo and Pizza Hut. During these negotiations, petitioner and Mr. Dickie discussed the damages suffered by petitioner as a result of PepsiCo's actions, including the damage to his relationship with the bank and the harm to his business reputation through adverse publicity in the press. On March 28, 1990, in compliance with the settlement agreement, petitioner transferred 393,948[3] shares of PMI stock to PepsiCo. On the same date, petitioner signed documents releasing all claims against PepsiCo and Pizza Hut. In consideration of the stock transfer and petitioner's release of claims, PepsiCo paid petitioner $3,250,071.

---

[3]Petitioner owned 386,448 shares of Pizza Management, Inc. (PMI). Additionally, petitioner controlled 7,500 shares that were beneficially owned by his wife and children. The total of these two amounts constitutes the 393,948 shares transferred to PepsiCo, Inc. (PepsiCo).

Of this amount, petitioner paid $300,000 to the attorneys handling the lawsuit against PepsiCo.

In preparing his 1990 Federal income tax return, petitioner allocated the $3,250,071 payment between two amounts. Petitioner treated $1,969,740[4] as the amount received for his shares of PMI and $1,280,331 as the amount received in exchange for the release of his claims against PepsiCo and Pizza Hut.

Petitioner's C.P.A., Wayne Hoover, advised petitioner in connection with the preparation of petitioner's 1990 Federal income tax return that the $1,280,331 was excludable from income under section 104(a)(2) as damages received on account of personal injuries. Petitioner did not report this amount as income on his 1990 Federal income tax return. Petitioner claimed on his return a basis of $1,469,309 in his PMI stock, consisting of the following:

| | |
|---|---|
| Original basis | $200,000 |
| Miscellaneous expenses | 100,000 |
| Received from children | [1] 61,875 |
| Travel expenses | 5,797 |
| Misc. legal fees | 1,637 |
| Legal fees paid | 300,000 |
| Contingent legal fees | [2] 800,000 |
|   Total | 1,469,309 |

[1] Petitioner, in his 1990 Federal income tax return, reduced his gain by $61,875, which represents the amount received which is attributable to his wife's and children's stock. Respondent concedes that this amount is not taxable to petitioner.

---

[4]Petitioner's allocation comports to the $5 per share book value reflected in the 1990 financial statements of PMI.

[2]In his 1990 Federal income tax return, petitioner included $800,000 in contingent legal fees in the basis of his stock. In the brief, petitioners admit that this was in error, and that the contingent portion of the fees amounted to only $500,000; thus, the $300,000 actually paid by petitioner was reported twice on his Federal income tax return. Accordingly, we will discuss this issue using the $500,000 amount as conceded by petitioner.

The difference between $1,969,740 (amount received for shares of PMI stock) and $1,469,309 was reported in petitioner's 1990 Federal income tax return as a long-term capital gain of $500,431.

Respondent, in her notice of deficiency, determined that the $3,250,071 received from PepsiCo was paid as consideration for petitioner's PMI stock, and no amounts were excludable under section 104(a)(2). Further, respondent limited petitioner's basis in the PMI stock to the $200,000 initially invested by petitioner.

Investment Interest Expense

Petitioner deducted $156,441 as investment interest expense in his 1990 Federal income tax return and reported $1,224,395 as an investment interest expense carryforward. These amounts related to petitioner's various loans from the bank.

Petitioner borrowed money from the bank on various dates throughout the 1980's. In return, petitioner executed promissory notes in favor of the bank, secured by petitioner's PMI stock and the assets of several other business ventures controlled by him.

One of these entities operated a restaurant and was called Out of Bounds, Inc. Another entity was Noel Exploration, Inc., a corporation engaged in the oil and gas business. The bank used separate customer numbers for Noel Exploration, Inc. (Cust. No. 10408), Out of Bounds, Inc. (Cust. No. 10626), and petitioner (Cust. No. 10398). Typically, the loans from the bank were for terms of 1 year. At the end of the term, petitioner typically rolled the outstanding principal and accrued interest into a new 1-year loan.

On December 3, 1984, the bank lent petitioner $549,312 from an unsecured line of credit (loan No. 10398/100160),[5] $497,620 of which was used to pay off a prior unsecured line of credit for Out of Bounds, Inc., and $51,692 was used to pay off the accrued interest.

On September 4, 1985, the bank lent petitioner $1,100,000 (loan No. 10398/102971). Of this amount, $650,000 was used to purchase 283 acres of land called the "Overland Trail" property, and $439,323 was used to satisfy the outstanding principal balance on loan No. 10398/100160. The record is silent with regard to the application of the remaining $10,677. Also, on December 18, 1985, a $125,000 unsecured line of credit was established between the bank and petitioner with loan No. 10398/105886.

---

[5]The number preceding the slash identifies the customer, and the number following the slash identifies the specific loan.

On December 19, 1986, the bank lent petitioner $1,570,000 (loan No. 10398/111752). The bank applied $102,155 to pay off loan No. 10398/105886, the balance owed on the unsecured line of credit ($97,779 principal and $4,376 interest). The bank applied $168,978 to pay off loan No. 10626/68956, an outstanding loan to Out of Bounds, Inc. The bank disbursed $30,000 to petitioner, and the bank charged petitioner $681 in fees. Finally, $1,154,545 was applied to pay off loan No. 10398/102971 ($1,107,123 for principal and $47,422 for interest). The remaining available balance of the note was to be used as a reserve for future interest accruals.

On September 8, 1987, the bank renewed loan No. 10398/111752 in the amount of $1,750,000. The increase of $180,000 was designated to satisfy accrued interest.

On August 15, 1988, the bank renewed loan No. 10398/111752, in the amount of $2 million with a maturity date of August 15, 1989. Again, the increase in the amount of the note represents accrued interest on the note. The note was secured by 160,000 shares of PMI stock.

By August 23, 1989, the bank began demanding payment of the $2 million note of August 15, 1988. As of March 22, 1990, the amount due on the note was $2,204,210, inclusive of principal and interest. On March 28, 1990, petitioner and the bank entered into a settlement agreement. Pursuant to the agreement, petitioner agreed to pay the bank $1,800,000 in full satisfaction of

principal and interest due on loan No. 10398/111752.  No amount was separately designated for principal or interest.  As of March 28, 1990, the principal portion of the note was as follows:

| | |
|---|---:|
| Principal balance from loan No. 10398/100160 | $439,323 |
| Amount advanced for Overland Trail property | 650,000 |
| Payoff of loan No. 10626/68956 | 168,978 |
| Payoff of principal of loan No. 10398/105886 | 97,779 |
| Funds advanced to petitioner | 30,000 |
| Loan fees | 681 |
| Total | 1,386,761 |

Petitioner, in his 1990 Federal income tax return, deducted investment interest expense in the amount of $156,441.[6]  Respondent disallowed this deduction.  Additionally, respondent determined that petitioner realized income of $404,210, the difference between the outstanding balance of $2,204,210 and the $1,800,000 actually paid by petitioner.

The T.J. Cinnamons Bakery Franchise

On November 30, 1987, petitioner entered into an agreement to purchase the assets of a T.J. Cinnamons Bakery franchise located in San Antonio, Texas.  T.J. Cinnamons Bakery is a company that specializes in bakery products.  Petitioner paid $60,000 to acquire the business and assumed a note in the amount of $181,058.

Shortly after the transaction was consummated, petitioner discovered that the seller had given him inaccurate financial

---

[6]The amount of the deduction was limited to petitioner's net investment income.

information and that the seller was unable to transfer certain business assets to petitioner. After petitioner initiated steps to rescind the transaction, the seller filed for bankruptcy. In 1990, the bankruptcy court discharged petitioner's claims against the seller. As a result of the bankruptcy court's decision, petitioner claimed a long-term capital loss of $357,356 in his 1990 Federal income tax return related to the T.J. Cinnamons Bakery franchise. The items that constitute the $357,356 were not separately identified in petitioner's Federal income tax return. Respondent limited the loss to petitioner's original basis of $241,058.

## OPINION

### Exclusions Under Section 104(a)(2)

Petitioner did not report $1,280,331 of the $3,250,071 received from PepsiCo as income on his 1990 Federal income tax return. Petitioner's C.P.A. advised him that the amount was excludable, pursuant to section 104(a)(2), as damages received on account of personal injuries. Respondent argues that petitioner has failed to establish that any portion of the amount received is excludable under section 104(a)(2). We disagree with respondent.

Section 61 provides that "gross income means all income from whatever source derived". Sec. 61(a). Unless the Internal Revenue Code specifically provides otherwise, all accessions to wealth must be included in gross income. Commissioner v. Glen-

shaw Glass Co., 348 U.S. 426 (1955). Exclusions from gross income have been narrowly construed. United States v. Centennial Sav. Bank, 499 U.S. 573 (1991).

Section 104(a)(2) provides an exclusion from income for "the amount of any damages received * * * on account of personal injuries or sickness". The term "damages" in section 104(a)(2) encompasses amounts received pursuant to settlement agreements. Sec. 1.104-1(c), Income Tax Regs. To be excludable, the under-lying claim must be based on tort type rights, and the damages must be received on account of personal injuries. O'Gilvie v. United States, 519 U.S. __, 117 S. Ct. 459 (1996); Commissioner v. Schleier, 515 U.S. __, 115 S. Ct. 2159, 2167 (1995).

The tax consequences of a settlement agreement depend on the nature of the litigation and on the origin of the claim but not on the validity of those claims. Woodward v. Commissioner, 397 U.S. 572 (1970). Where a settlement agreement lacks specific language, the intent of the payor is the most important factor in determining the nature of the claim being settled. Knuckles v. Commissioner, 349 F.2d 610 (10th Cir. 1965), affg. T.C. Memo. 1964-33.

In his 1990 Federal income tax return, petitioner allocated some of the proceeds received from PepsiCo to nontaxable amounts received in settlement of a lawsuit under section 104(a)(2). Petitioner, in connection with the transfer of PMI stock to PepsiCo, signed a release which discharged his claims against

Pizza Hut and PepsiCo (release).  The release states, in perti-

nent part:

>     The undersigned, Wallace R. Noel, does hereby
> release and forever discharge Pizza Hut, Inc., PepsiCo,
> Inc., and all of their subsidiaries, divisions and
> related companies, and all of their employees, officers
> and agents, from any and all claims, actions, and
> causes of action, now existing or that may arise here-
> after, known and unknown, and including, in particular
> but without limitation, all claims that have been
> asserted or that could be asserted in that certain
> action pending in Sedgwick County District Court,
> Sedgwick County, Kansas, captioned:

> > Wallace R. Noel, Larry D. Noel, Michael L. Noel
> > and Cathy R. Noel vs. Pizza Hut, Inc., a corpora-
> > tion, PepsiCo, Inc., a corporation, Pizza Manage-
> > ment, Inc., a corporation, and Arturo G. Torres,
> > Case No. 88 C 1652.

> >     The undersigned agrees that, as a part of this
> > Release, the referenced action, as it relates to Pizza
> > Hut, Inc. and PepsiCo, Inc., shall be dismissed, with
> > prejudice, forthwith and agrees further that he shall
> > take whatever action is necessary to bring about such a
> > dismissal. * * *

The release lacks any language concerning the amount of

money petitioner received, if any, as consideration for signing

this release.  Further, the stock transfer agreement states:

> Upon delivery to me or my designee of (i) $3,250,071 in
> immediately available funds and (ii) your release of
> claims against me, I will transfer to Pizza Hut, Inc.
> (by delivery of the Shares and the Powers) good, valid
> and marketable title to all of the Shares * * *.

The stock transfer agreement does not specify what portion of the

proceeds, if any, was paid to petitioner for his release of

claims.  Since the documents presented by petitioner lack any

language concerning what, if any, portion of PepsiCo's payment

represents consideration for petitioner's signing the release, we will look to the intent of the payor (PepsiCo) to determine what portion was paid for petitioner's release of his claims.

At trial, Mr. Dickie, PepsiCo's representative in the transaction, testified that the amount paid to petitioner was based solely on PepsiCo's valuation of the PMI corporation.[7] Mr. Dickie testified that the amounts paid to petitioner related only to the value of the PMI stock, and no amounts were paid for the release of claims obtained by PepsiCo. Mr. Dickie indicated that it was a normal business practice to obtain a general release from all sellers in these types of situations.

We cannot accept this testimony at face value. The evidence before the Court belies Mr. Dickie's assertion that no amounts were paid for the settlement of claims. First, the release is not merely a general release of claims. Rather, the release specifically identifies petitioner's claims asserted against PepsiCo and Pizza Hut in the action pending in Sedgwick County District Court. Second, it is evident from the documents presented at trial that PepsiCo would not have purchased petitioner's stock in PMI without also receiving his release of claims. It is apparent that PepsiCo paid petitioner $3,250,071,

---

[7]In his testimony Mr. Dickie explained that a retail food franchise is usually valued based on either a percentage of sales income or a multiplier of income before depreciation and taxes. According to Mr. Dickie, these methods were applied to PMI in order for PepsiCo to arrive at the $8.25 per share price paid by PepsiCo to petitioner.

both to purchase his stock and to settle his claims. Accordingly, we must allocate the $3,250,071 between the value of the stock in PMI and the value of settling petitioner's claims.

It would serve no purpose to delve into detailed discussions concerning the weight of specific testimony or the credibility of certain evidence. We make this allocation based on the totality of the evidence before the Court, while allowing for a certain amount of overstatement, or understatement, in the assertions contained in the testimony before us. See Eisler v. Commissioner, 59 T.C. 634 (1973). Therefore, based on the evidence, we conclude that PepsiCo paid $2,363,688 for the PMI stock, or $6 per share. Consequently, we find that the remainder of the amount paid to petitioner by PepsiCo, an amount equal to $886,383, was paid to settle petitioner's claims in contract and in tort.

To exclude under section 104(a)(2) the proceeds from the settlement of a claim, the claim (1) must be based on tortlike rights and (2) must be "on account of" personal injuries. Commissioner v. Schleier, 515 U.S. __, 115 S. Ct. 2159 (1995). Petitioner's first two claims against PepsiCo constitute contract claims not covered by section 104(a)(2). Petitioner's third claim is an action in tort. See Maxwell v. Southwest Natl. Bank, 593 F. Supp. 250, 253 (D. Kan. 1984); Turner v. Halliburton Co., 722 P.2d 1106, 1115 (Kan. 1986). Further, we are satisfied that petitioner suffered personal injuries. The phrase "on account of

personal injuries" includes both nonphysical and physical injuries.  United States v. Burke, 504 U.S. 229, 235 n.6 (1992); Threlkeld v. Commissioner, 848 F.2d 81, 84 (6th Cir. 1988), affg. 87 T.C. 1294, 1308 (1986).  Section 104(a)(2) has been held to apply to several types of nonphysical personal injuries, such as emotional distress, United States v. Burke, supra; mental pain and suffering, Bent v. Commissioner, 835 F.2d 67 (3d Cir. 1987), affg. 87 T.C. 236 (1986); indignity, humiliation, inconvenience, pain and distress of mind, and prevention from attending usual pursuits, Threlkeld v. Commissioner, supra at 81-82; and injury to personal, professional, and credit reputation, Church v. Commissioner, 80 T.C. 1104 (1983).  The evidence before the Court is that PepsiCo's actions caused petitioner to suffer emotional distress and resulted in damage to petitioner's business reputation.[8]  Petitioner discussed these damages with Mr. Dickie during the settlement negotiations.  The payment made by PepsiCo was intended to settle both the contract claims and the tort claim.  Thus, we conclude that part of the settlement payment was excludable, and part was not excludable under section 104(a)(2).

If a settlement payment covers both contract claims and excludable tort claims, then we may allocate amounts to each claim.  Stocks v. Commissioner, 98 T.C. 1, 14 (1992); Eisler v.

---

[8]When contracts are interfered with in a tortious manner, a litigant may recover damages for emotional distress.  McLoughlin v. Golf Course Superintendents Association of Am., No. 85-4499-R (D. Kan., Apr. 8, 1991).

_Commissioner_, _supra_ at 640. The record does not contain a great deal of evidence to help this Court in making an allocation. As we stated in _Eisler v. Commissioner_, _supra_ at 641, under these circumstances, "the most that can be expected of us is the exercise of our best judgment based upon the entire record." Therefore, we conclude that, of the $886,383 in settlement proceeds apportionable to the release of petitioner's claims in contract and in tort, one-third was paid to settle the tort claim. Accordingly, one-third of the $886,383, or $295,461, is excludable under section 104(a)(2).

Basis of Petitioner's PMI Stock

In his 1990 Federal income tax return, petitioner included the following amounts in the basis of his PMI stock: $100,000 of miscellaneous expenses, $5,797 in additional travel costs, $1,637 in miscellaneous legal fees, and $800,000 in legal costs related to the PepsiCo litigation ($300,000 actually paid and $500,000 in contingent fees; see _supra_ p. 8 table note 2). Respondent, in her notice of deficiency, determined that none of these amounts should have been included in petitioner's PMI stock basis. We will deal with each of these items in turn.

The Commissioner's determinations are presumed correct. Rule 142(a); _Welch v. Helvering_, 290 U.S. 111, 115 (1933). Petitioner has the burden of establishing the correct basis of his PMI stock. _Burnet v. Houston_, 283 U.S. 223, 228 (1931).

At trial, petitioner and his C.P.A. testified that the $100,000 in miscellaneous expenses and the $5,797 in travel expenses were paid by petitioner as a stockholder of PMI. However, petitioner did not produce any records at trial to substantiate these claimed expenses. A determination of basis is a factual one, for which the burden of proof rests with petitioner. Hinckley v. Commissioner, 410 F.2d 937 (8th Cir. 1969), affg. T.C. Memo. 1967-180. Petitioner's self-serving testimony, without any additional proof, fails to meet this burden. Because petitioner failed to substantiate his expenses, the miscellaneous and travel expenses are not allowable items in computing petitioner's basis in his PMI stock.

Petitioner argues on brief that $8,800 in accounting fees should be included in the basis of his PMI stock.[9] Petitioner has failed to demonstrate that the accounting firm did any work related to the PMI stock. In her notice of deficiency, respondent has allowed this $8,800 in fees as miscellaneous deductions. Respondent's notice of deficiency is presumed correct. Welch v. Helvering, supra at 115. Since petitioner failed to put on any evidence, outside of his own testimony, as to the nature of the accounting work, we find for respondent.

---

[9]Petitioner reported $1,637 of miscellaneous legal fees in the basis of his PMI stock. Respondent, in her notice of deficiency, allowed these expenses as miscellaneous itemized deductions. Petitioner, in his reply brief, agreed that these fees were properly accounted for in the notice of deficiency.

Petitioner paid $300,000 to his lawyers upon the settlement of claims against PepsiCo and increased the basis of his PMI stock.  Again, respondent, in her notice of deficiency, allowed petitioner these fees as a miscellaneous itemized deduction.  For the reasons set out below, we hold that $219,000 of these fees is a proper addition to the basis of petitioner's stock, $54,000 of the fees is deductible as a miscellaneous itemized deduction, and $27,000 of the fees is nondeductible.  Section 265 precludes a deduction for legal expenses attributable to a class of income that is exempt from taxation.  Section 1.265-1(c), Income Tax Regs., provides as follows:

> Expenses and amounts otherwise allowable which are directly allocable to any class or classes of exempt income shall be allocated thereto; and expenses and amounts directly allocable to any class or classes of nonexempt income shall be allocated thereto.  If an expense or amount otherwise allowable is indirectly allocable to both a class of nonexempt income and a class of exempt income, a reasonable proportion thereof determined in the light of all the facts and circum- stances in each case shall be allocated to each.

Ordinarily, we allocate the legal expenses in the same proportion as the settlement payment.  See Stocks v. Commis- sioner, supra at 18; Metzger v. Commissioner, 88 T.C. 834, 860 (1987), affd. 845 F.2d 1013 (3d Cir. 1988); Church v. Commis- sioner, supra at 1110-1111.  But see Eisler v. Commissioner, supra at 642.  Based on the evidence, a proportionate allocation is appropriate in this case.  We have held that 73 percent of the settlement payment was paid for petitioner's stock, 18 percent

was paid to settle petitioner's two contract claims, and 9 per- cent was paid to settle his tort claim. We, therefore, conclude that 9 percent of the legal expenses, or $27,000, is not deduct- ible. Also, $54,000 of the legal fees, the amount related to petitioner's two contract claims, is deductible as a miscel- laneous itemized deduction.

Next, we must decide whether the legal fees allocated to the sale of petitioner's stock, or $219,000, were properly added to the basis in petitioner's stock, as argued by petitioner, or whether the fees are deductible as miscellaneous itemized deductions, as respondent contends. In litigation involving the acquisition or disposition of capital assets, the origin and character of the claim control in deciding whether or not legal expenses should be capitalized. Woodward v. Commissioner, 397 U.S. 572 (1970). This Court has applied the same rule to cases involving the defense or perfection of title to property. See Boagni v. Commissioner, 59 T.C. 708 (1973). Consideration must be given to the issues involved, the nature and objectives of the litigation, and the background and the facts surrounding the controversy. Id. at 713.

Petitioner transferred his Pizza Hut franchises in exchange for PMI stock because he was under the impression that PMI possessed the right to issue its stock in a public offering without restrictions from Pizza Hut. When PepsiCo contested PMI's public offering, petitioner instituted a lawsuit to enforce

these rights. The litigation involved the transferability of PMI's stock, thereby implicating the "perfection of title" by petitioner, and the litigation culminated in the sale of the stock to PepsiCo. Thus, 73 percent of the legal expenses, or $219,000 of the $300,000 legal fees paid, was properly included in the basis of petitioner's stock and treated as an offset against the sale price. See Reed v. Commissioner, 55 T.C. 32 (1970) (legal expenditures to remove restrictions on the transferability of a partnership interest are capital in nature).

In addition to the $300,000 of legal fees paid to the attorneys, petitioner included $500,000 in the basis of his PMI stock. The $500,000 related to a contingent note, executed by petitioner, payable to the law firm involved in the litigation. Payment on the note was contingent upon any future awards from the PMI litigation.

Generally, a contingent liability may not be added to basis. Albany Car Wheel Co. v. Commissioner, 40 T.C. 831, 839 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964). Petitioner, however, relies on Roberts Co. v. Commissioner, a Memorandum Opinion of this Court dated June 15, 1945, to support his claim of propriety of this addition to basis. This reliance is misplaced. The taxpayers in Roberts capitalized contingent attorney's fees paid for defense of claims against their father's estate. The fees were paid out of the estate, because the defense was successful. Thus, the contingency had been met, and

the legal expenses paid, prior to being capitalized into the basis of the property. Here, the contingency had not been met, and the fees had not been paid. Accordingly, the contingent fees cannot be treated as an addition to basis in petitioner's stock in PMI.

Deductions in Connection With T.J. Cinnamons Bakery

In his 1990 Federal income tax return, petitioner deducted $357,356 as a long-term capital loss from his failed investment in a T.J. Cinnamons Bakery franchise. On brief, however, petitioner argues that the basis of the franchise consisted of the following amounts:

| | |
|---|---|
| Cash paid by petitioner | $60,000 |
| Note assumed by petitioner | 181,058 |
| Capitalized expenses | 86,175 |
| Total | [1] 327,233 |

[1]Petitioner's counsel, in his trial brief, admits that petitioner was not able to reconstruct the $357,356 amount reported in the 1990 Federal income tax return. Therefore, our discussion will focus on the $327,233 amount testified to by petitioner's accountant, Mr. Hoover.

Respondent contends that the basis is limited to the amount allowed in the notice of deficiency, $241,058, representing the cash paid and the note assumed by petitioner. Thus, the expenses of $86,175 remain in dispute. For the reasons set forth herein, we conclude that the basis is $241,058.

Petitioner included $86,175 of expenses in the basis of his T.J. Cinnamons Bakery investment. A taxpayer is responsible for

maintaining sufficient records to substantiate the propriety of a deduction.  Sec. 1.6001-1(a), Income Tax Regs.  At trial, no reliable evidence was produced by petitioner.  A photocopy of a handwritten note made by Mr. Hoover listing various expenses was produced.  Many of the items in the handwritten note were illegible, the descriptions were ambiguous, and no amounts were supported by documentation.  Petitioner also produced a letter from his lawyers, listing expenses incurred by petitioner.[10]  The letter does not assist petitioner in substantiating his expenses.  Accordingly, we find petitioner's evidence insufficient to substantiate his claimed expenses involving the T.J. Cinnamons Bakery franchise.

Investment Interest Expense Deduction

Respondent, in her notice of deficiency, disallowed petitioner's claimed investment interest expense deduction of $156,441 and determined that petitioner realized $404,210 of income from debt forgiveness.[11]  On brief, respondent abandoned

---

[10]The letter from petitioner's attorneys was sent to the sellers of the T.J. Cinnamons Bakery franchise.  It was written as part of petitioner's attempts to rescind the transaction and recover his money.

[11]Petitioner, in his 1990 Federal income tax return, reported $1,224,395 as investment interest expense carry forward. This amount was also disallowed by respondent in her notice of deficiency.  This disallowance affected the deficiency determined for 1991.  Petitioner concedes on brief that the 1990 Federal income tax return inaccurately reported interest accrued in prior years, because none of that interest was actually paid until 1990.  Accordingly, the interest carried forward will consist

(continued...)

this argument because she calculated that the principal balance of petitioner's borrowings was something less than the $1,800,000 he ultimately paid to the bank. Respondent therefore concluded that the remaining balance of petitioner's payment represented interest accrued by the bank. Specifically, respondent determined that $1,386,761 of petitioner's $1,800,000 payment to the bank constituted payment of principal, and $413,239 related to interest. Respondent calculated the principal balance by tracing payments through the bank's "Loan Commitment" sheets to determine how the funds were actually disbursed. This analysis was detailed, credible, and persuasive.

Petitioner relies on "Interest Paid" statements he received from the bank to support his contention that more than $413,239 of the $1,800,000 payment to the bank related to interest. Included in these statements was a $71,321.97 amount of interest "paid" for 1990. However, a bank "Charge Off Authorization" form indicates that the $71,321.97 amount was actually written off by the bank. Therefore, the Court finds that the bank's "Interest Paid" statements do not reflect interest actually "paid" by petitioner. Petitioner failed to introduce any other evidence at trial concerning the principal balance on the notes or the interest paid to the bank. Accordingly, we sustain respondent's

---

[11](...continued)
only of the interest expense the Court determines has been "paid" in 1990 but not deducted by petitioner due to sec. 163(d) limitations.

determination that petitioner paid $413,239 in interest charges for 1990.

## Legal Expenses

In her notice of deficiency, respondent disallowed $19,975 in legal expenses claimed as a deduction in 1991. Since petitioner failed to address this issue either at trial or in his brief, we treat this as a concession by petitioner and find for respondent.

## Penalties

In her notice of deficiency, respondent determined that petitioners were liable for penalties for fraud pursuant to section 6663. Prior to trial, respondent conceded that no amounts were due for fraud. In her answer to the petition, respondent asserted an accuracy-related penalty against petitioners pursuant to section 6662(a) for their 1990 and 1991 Federal income tax returns. Since the accuracy-related penalty was first raised in her answer to the petition, respondent has the burden of proof on this issue.

An accuracy-related penalty equaling 20 percent of the underpayment may be imposed for any one of five reasons. Sec. 6662(a). One such reason exists where the taxpayer is negligent in completing his return. Sec. 6662(b)(1). Negligence includes "any failure to make a reasonable attempt to comply with the provisions" of the Internal Revenue Code. Sec. 6662(c). This Court has defined negligence as the "lack of due care or failure

to do what a reasonable and ordinarily prudent person would do under the circumstances."  Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)).

A taxpayer can avoid liability for the accuracy-related penalty if he engages a competent professional to prepare his return, and he reasonably relies on the advice of that professional.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011, 1017 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  The taxpayer must show that he provided all relevant information to the professional.  Pessin v. Commissioner, 59 T.C. 473, 489 (1972).

Petitioner engaged Wayne Hoover, a C.P.A. with over 20 years of experience, to prepare his 1990 and 1991 Federal income tax returns.  Petitioner was a longtime client of Mr. Hoover's and heavily relied on Mr. Hoover's advice.  After discussing the facts with petitioner, Mr. Hoover advised petitioner to exclude income under section 104(a)(2) and include the contingent legal fees in his PMI stock basis.  Since the burden of proof is on respondent, she must prove that petitioner failed to provide relevant information to Mr. Hoover and that petitioner's reliance on Mr. Hoover was improper.  Respondent has failed to meet this burden.  The penalties for 1990 and 1991 are not sustained.

Decision will be entered under Rule 155.