T.C. Memo. 1999-117


UNITED STATES TAX COURT


ALLEN BURDITT II AND SARAH MAUNEE S. BURDITT, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 916-96.                                    Filed April 6, 1999.


Kenneth A. Love, for petitioners.

Carol B. McClure and Andrew M. Tiktin, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined the following deficiencies, addition to tax, and accuracy-related penalties for the taxable years 1991, 1992, and 1993:

| Year | Deficiency | Addition to Tax Sec. 6651(a) | Penalty Sec. 6662(b)(1),(2) |
|---|---|---|---|
| 1991 | $72,523 | --- | $7,570 |

| 1992 | 258,998 | $89,391 | 11,918 |
| 1993 | 31,871 | --- | 6,356 |

After concessions, the remaining issues for decision are: (1) Whether amounts received by petitioners in 1992 pursuant to settlement agreements were damages received on account of personal injuries under section 104(a)(2),[1] and (2) whether petitioners are liable for a section 6662(a) penalty for 1992.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, the first supplemental stipulation of facts, and the attached exhibits.

At the time of the filing of their petition, petitioner Allen Burditt II resided in Houston, Texas, and petitioner Sarah Maunee S. Burditt resided in Sante Fe, New Mexico.

Hereinafter, we shall refer to petitioner Allen Burditt II as "petitioner" or "Mr. Burditt", and references to "petitioners" are to Allen Burditt II and Sarah Maunee S. Burditt.

From 1988 through 1993, petitioner was the president of Carancahua Resources, Inc. (CRI), a Texas corporation, and petitioners held a controlling interest in the corporation that owned 80 percent of CRI's stock. In 1988, CRI acquired the lease

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

covering a previously completed oil and gas well and obtained authorization to reenter the well.

Before perforating the well, CRI needed certain items to complete the well, including a "packer". A packer is an expandable device that is run either in an open well, in a cased hole, or in tubing to counteract pressure exerted by underground oil and gas and prevent such fluids from flowing vertically. CRI purchased the packer from Lindsey Completion Services, Inc. ("Lindsey"). The Lindsey packer did not function effectively. On October 3, 1988, after attempts to obtain a pressure test of its seals were unsuccessful, the Lindsey packer was removed from the well. Lindsey then provided a replacement packer, which was placed in the well.

On October 4, 1988, CRI perforated the well at 9:30 a.m. At approximately 11:00 a.m., the well developed a gas leak at the wellhead,[2] which indicated that high pressure was being exerted from the production zone below. As a result of this leak, gas and liquid began escaping into the atmosphere in an uncontrolled manner, a condition referred to as a "blowout". The well emitted large quantities of gas and oil, placing the lives of the 20 to 30 workers in the surrounding area, as well as Mr. Burditt's, at imminent risk due to the possibility that a spark from static

---

[2] A "wellhead" is the portion of the well above ground that seals the top of the well onto the surface casing or conductor pipe.

electricity would ignite the oil and gas. CRI ordered four truck loads of "heavy mud", which is used to contain uncontrolled wells by pumping it into the well bore to offset the pressure of the escaping oil and gas. CRI also contacted a company that had the necessary tools and equipment to pump the heavy mud to control the well, but after surveying the scene, that company's manager decided it was too dangerous and departed with his crew. CRI then telephoned Halliburton Services, Inc. ("Halliburton"), and Halliburton personnel agreed on the phone to control the well. Halliburton personnel arrived at the well site at approximately 4:00 p.m. However, Halliburton's supervisory employee in charge at the well site, Mr. Ken Weitzel, refused to allow Halliburton's employees or equipment to get any closer than approximately 200 yards from the wellhead. As a result, Mr. Burditt and volunteers from the other work crews had to assemble the pipeline from Halliburton's equipment to the wellhead. Mr. Burditt and the volunteers had to do this while being simultaneously sprayed by the erupting oil and gas, which was so cold that it caused gloves to freeze, and by hoses of fresh water to reduce the risk of ignition. It took approximately 30 to 45 minutes to perform the hookup task under these conditions. When the hookup was completed, Mr. Weitzel then refused to start pumping the heavy mud until Mr. Burditt could produce a check for $30,000, which amount Halliburton believed CRI owed it for past services. A CRI

employee wrote a personal check in that amount, and Halliburton started pumping the heavy mud. Soon thereafter, Mr. Weitzel demanded a corporate check from CRI, which petitioner could not produce at that time. Although the well had not been controlled, Mr. Weitzel ordered the pumps stopped. Mr. Weitzel forced petitioner to hand over his car keys and wallet, and to sign over his residence (on a handwritten document prepared by Mr. Weitzel) before he agreed to start pumping again. Mr. Weitzel stopped and started pumping twice more, starting only after first demanding a check for $30,000 brought by Mrs. Burditt on CRI's behalf, and then after forcing petitioner to sign an indemnity agreement that Halliburton had delivered to its employees at the well site. In each instance, the pumping was stopped by Mr. Weitzel when the intensity of the oil and gas eruption had lessened, and the pumps remained off until the intensity of the eruption had resumed significantly. The indemnity agreement contained language releasing Halliburton from all liability stemming from contractual, negligence, or strict liability claims that CRI could assert relating to Halliburton's efforts to control the well. Eventually, Halliburton completed the pumping and "killed the well".

In February 1989, CRI and petitioner, as joint plaintiffs, filed a lawsuit in the District Court of Jefferson County Texas, naming various defendants including Lindsey and Halliburton.

In the original petition, CRI alleged that Lindsey provided defective equipment and services. CRI also claimed that Lindsey's actions caused a blowout at the well, and as a result, CRI (but not petitioner individually) suffered significant economic damages. The petition did not state any claims against Lindsey that were personal to petitioner. With respect to Halliburton, however, the petition did assert claims that were personal to petitioner. CRI and petitioner alleged that Halliburton entered into an agreement to provide emergency services at the well site and then ceased the performance of its obligations under their agreement, thereby contributing to the damage of the well. The petition claimed that these actions by Halliburton caused both CRI and petitioner economic damages, and in addition caused petitioner severe embarrassment and mental anguish. CRI and petitioner subsequently filed first, second, third, and fourth amended petitions in March 1989, January 1990, September 1991, and October 1991, respectively. Mr. Burditt's allegations in his personal capacity against Halliburton did not change in the amended petitions. However, certain of the amended petitions did contain new allegations of personal injury. In the second and third amended petitions, an unidentified "plaintiff"-- that is, either petitioner or CRI--alleged a claim under the Texas Deceptive Trade Practice Act - Consumer Protection Act, Tex. Bus. & Com. Code sec. 17.50 (Vernon 1989), against Lindsey.

Subsequently, the fourth amended petition alleged that "plaintiffs"--that is, both petitioner and CRI--suffered mental anguish, torment, and heartache.  Lindsey filed a motion to strike the fourth amended petition because it was filed 22 days late under the trial court's docket control order.  The trial court granted this motion and struck the fourth amended petition in January 1992.

In the second and third amended petitions, CRI and petitioner claimed $10 million in actual damages and $5 million in punitive damages.

Lindsey, and CRI and petitioner, retained expert witnesses to give testimony regarding the economic damages resulting from the well blowout.  An expert for CRI and petitioner estimated the total losses as a result of damage to the well and lost production capacity at a present value of more than $3 million in March of 1991.  An expert for Lindsey concluded that the well had never been commercially viable.  No experts were retained to testify with respect to personal injuries of petitioner.  However, CRI and petitioner did take the deposition of at least five eyewitnesses to Halliburton's actions at the blowout.  Neither Lindsey or Halliburton deposed petitioner.

On or about April 24, 1989, Halliburton served CRI and petitioner with interrogatories, to which they jointly responded.  The interrogatories and responses included the following:

7.  Please state all facts which support your contention that Halliburton's actions contributed to damage the Davis No. 1 well.

    Answer:  A deep hackberry well is an extremely volatile situation which requires precise control. When this well blew-out, the damage was being done to well formation on a continuous basis. The longer the damage was allowed to continue, the greater the damage would be. Since Halliburton could have controlled the well very quickly had it performed its obligations as promised, the damage which was done to the formation may very well have been minimized, if not eliminated. Accordingly, Halliburton's failure to control the well in an expeditious and professional manner probably contributed to the full extent of the damage that occurred to the formation.

8.  Please state the damages you allege were caused by Halliburton, setting out each element and describe how you claim it is related to anything done by Halliburton. Please state specifically the amount you allege against Halliburton.

    Answer:  The well formation was damaged and ultimately the well was incapable of producing from the formation originally perforated. Therefore the cost of drilling a new well will have to be incurred. However that may not result in restoration of production. CRI and Allen Burditt owned a significant interest in the well prior to the blow-out. As a result of the blow-out and the cost overruns that necessarily follow it, they were required to sell a significant part of their interest in the well. Thus, they have forever lost the value of the production in place which they now cannot recover. The amount of this production is presently being calculated but is in excess of $2,000,000.00. The cost of drilling another well [is] in excess of $1,000,000.00.

On or about August 5, 1991, Halliburton filed a motion for summary judgment against CRI. Halliburton asserted that the indemnity agreement signed by Mr. Burditt, acting on CRI's behalf, precluded CRI from holding Halliburton liable for damage to CRI's property as a result of Halliburton's negligence or strict liability. On September 19, 1991, the trial court granted Halliburton's summary judgment motion against CRI, leaving only petitioner's personal claims against Halliburton pending before that court. Subsequently, CRI perfected an appeal of the order granting Halliburton's motion for summary judgment. Oral arguments with respect to the appeal were set for October 22, 1992.

On or about October 6, 1991, Lindsey filed a motion for summary judgment against CRI and petitioner. The motion asserted that petitioner had no personal claims against Lindsey, a claim which petitioner and CRI did not contest in their response to the motion. The trial court denied Lindsey's motion.

A mediation session to address the claims of CRI and petitioner against Lindsey and Halliburton was set for June 24, 1992. In their mediation submission, CRI and petitioner focused almost exclusively on the legal grounds for holding Lindsey liable for the damages to the well formation. Their submission did not mention the events surrounding the efforts to control the blowout or otherwise make any reference to Halliburton, except to

note that a previous Halliburton settlement offer was rejected. At mediation, Lindsey made a settlement offer that the plaintiffs did not accept, nor did the plaintiffs settle any of their claims against Halliburton.

Subsequently, Lindsey submitted a trial brief that did not address any personal injury claims, but rather focused exclusively on the law pertaining to CRI's economic claims against Lindsey.

Prior to trial, petitioner contacted Lindsey's counsel, expressing an interest in accepting the previously refused settlement offer by Lindsey. Negotiations ensued, and petitioner, for himself and on behalf of CRI, agreed to settle all claims against Lindsey for $550,000. The settlement amount was agreed between Lindsey's counsel and petitioner without any discussion of an allocation of an amount to any of the specific claims of petitioner or CRI. A provision was added to the written settlement agreement, at petitioner's behest, which provided:

> For the purposes of allocating damages between CRI and Burditt in the settlement of this action, Five Hundred Thousand and no/100 Dollars ($500,000.00) shall be credited to [Mr. Burditt] individually for mental anguish, pain and suffering, damage to his reputation and loss of good will and Fifty Thousand and no/100 Dollars ($50,000.00) to [CRI] for damages to good will and damage to loss of business reputation.

Petitioner had instructed the attorney representing him and CRI in connection with the settlement to make sure that the

settlement document contained "the proper personal injury language". The attorney consulted with a certified public accountant to obtain the precise wording. Lindsey's counsel did not negotiate over the terms of the allocation or object to its inclusion in the agreement. The settlement agreement was executed on August 8, 1992.

On August 14, 1992, Lindsey's insurer wrote a check payable to CRI and petitioner in the amount of $400,000, and a check payable to their attorney in the amount of $150,000. Petitioners split the $400,000 check into money orders in the amounts of $328,325.81 and $50,000 payable to petitioner and CRI respectively, while taking the remainder in cash. Petitioners deposited both of the money orders into Mrs. Burditt's personal bank account.

Subsequent to the failed mediation petitioner also contacted Halliburton through its counsel to explore settlement. Previously, Halliburton's outside counsel handling the litigation had discussed settlement with an in-house lawyer at Halliburton. The outside counsel outlined his views on settlement in a letter to the in-house counsel dated May 11, 1992. In that letter, outside counsel expressed his view that the trial court's granting of summary judgment in favor of Halliburton would probably be reversed on appeal with respect to the gross negligence and intentional tort allegations, with a remand for a

jury trial on those allegations. The letter stated: "Since the alleged damaging conduct; i.e. turning off the pumps, was intentional conduct, it is my opinion that we have some exposure for whatever damages resulted from the delay." The letter then cited the substantial expense of obtaining expert testimony to counter petitioner's and CRI's expert witness's evaluation of the well's value, and the additional legal work, in trying the case. The letter recommended settling the case for $200,000 or less, characterizing this as a "cost of defense" settlement. The in-house lawyer at Halliburton used this letter to obtain settlement authority in the amount of $200,000.

Counsel representing petitioner and CRI sent a proposed settlement agreement to Halliburton's counsel, which allocated the entirety of a proposed settlement of $250,000 to petitioner "Individually, for mental anguish, pain and suffering, damage to his reputation and loss of good will", with no allocation to CRI. Halliburton's counsel responded by returning the proposed agreement after changing the settlement amount to $200,000 and deleting the language allocating it to petitioner individually for personal injury claims. Halliburton's counsel deleted the allocation language because he was concerned that CRI might later be able to disavow the settlement, based on absence of consideration, if the settlement proceeds were allocated entirely to petitioner. Counsel for CRI and petitioner nevertheless

insisted on the allocation language as originally proposed. Halliburton's counsel relented, after concluding that since Halliburton had been granted summary judgment on CRI's claims, CRI's agreement to dismiss its appeal of the summary judgment order would make it final, thus foreclosing any reassertion of CRI's claims.

On September 14, 1992, the parties executed a settlement agreement under which Halliburton paid $200,000 in exchange for CRI's and petitioner's dismissal of all actions against Halliburton. The allocation language included in the Halliburton settlement agreement, which was modeled after the language previously used in the Lindsey settlement agreement, stated:

> For the purposes of allocating damages between CRI and Burditt in the settlement of these actions, Two Hundred Thousand and no/100 Dollars ($200,000.00) shall be credited to [Mr. Burditt], Individually, for mental anguish, pain and suffering, damage to his reputation and loss of good will.

On September 4, 1992, the petitioners deposited Halliburton's check in the amount of $200,000, payable to both CRI and petitioner, in Mrs. Burditt's personal bank account.

OPINION

The controversy in this case centers on the tax treatment of the Lindsey and Halliburton settlement payments that petitioner received in 1992. Petitioners contend that the settlement payments were received on account of Mr. Burditt's personal injuries and are therefore excludable from gross income under

section 104(a)(2).  Respondent counters that petitioners are not entitled to exclude the settlement payments from gross income under section 104(a)(2) because neither Lindsey or Halliburton intended to compensate petitioner for personal injuries.

Section 61(a) provides that gross income includes all income from whatever source derived.  While section 61(a) broadly applies to any accession to wealth, statutory exclusions from income are narrowly construed.  See Commissioner v. Schleier, 515 U.S. 323, 327 (1995); United States v. Burke, 504 U.S. 229, 233 (1992); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  One such statutory exclusion appears in section 104(a)(2), which excludes from gross income damages received on account of personal injuries or sickness, whether by suit or agreement.  Damages received are excludable from gross income under section 104(a)(2) if the underlying action was based on tort or a tort type claim and the amounts received were paid on account of, and to compensate for, personal injuries or sickness. See Commissioner v. Schleier, supra at 336-337; sec. 1.104-1(c), Income Tax Regs.  The primary characteristic of a tort type claim is the availability of compensatory remedies which are traditionally evidenced by "a broad range of damages to compensate the plaintiff 'fairly for injuries caused by the violation of his legal rights.'"  Commissioner v. Schleier, supra at 335 (quoting United States v. Burke, supra at 235).  Amounts

received on account of a personal injury claim traditionally involve payment for harms such as pain and suffering, emotional distress, harm to reputation, or other consequential damages. See United States v. Burke, supra at 239.

When determining the tax consequences of an amount paid in settlement of a suit, it is the nature of the underlying claim, not its validity, that determines whether the payment was received on account of personal injuries. See id. at 237; Fabry v. Commissioner, 111 T.C. 305, 308 (1998); Threlkeld v. Commissioner, 87 T.C. 1294, 1297 (1986), affd. 848 F.2d 81 (6th Cir. 1988); Glynn v.Commissioner, 76 T.C. 116, 119 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982). In seeking the nature of the underlying claim, the court should consider, "'In lieu of what were the damages awarded?'" Robinson v. Commissioner, 102 T.C. 116, 126 (1994)(citing Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110, 113 (1st Cir. 1944), affg. 1 T.C. 952 (1943)(emphasis added)). Whether the nature of the underlying claim is for a tort type personal injury is a question of fact, which is determined by considering the settlement agreement in light of all the facts and circumstances, including the allegations made in the State court proceedings, the evidence marshaled, the arguments made by the parties, and the intent of the payor of the settlement. See Robinson v. Commissioner, supra at 127. Paramount to this inquiry is the payor's intent in

making the settlement payment.  See Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Robinson v. Commissioner, supra at 127.  Any one of these factors may be either persuasive or ignored.  See Threlkeld v. Commissioner, supra at 1306.

If the settlement agreement expressly allocates the settlement between tort type personal injury damages and other damages, it will be respected for tax purposes to the extent that the parties entered into the agreement in an adversarial context at arm's length and in good faith.  See Robinson v. Commissioner, supra at 127.  Express allocations in a settlement agreement are respected if the parties are adversarial with respect to those allocations and not merely adverse as to the total sum of the settlement.  See Robinson v. Commissioner, supra.  The determination of whether the parties are adversarial for this purpose is a question of fact.[3]  See Robinson v. Commissioner, 70 F.3d 34, 38 (5th Cir. 1995), affg. in part, revg. in part on another ground and remanding 102 T.C. 116 (1994).

---

[3]  In their reply brief, petitioners assert for the first time that any testimony contradicting the express language of the settlement agreement contravenes the parol evidence rule and therefore should be disregarded.  Because this contention was not timely raised, we shall not consider it.

## 1.  Lindsey Settlement

The notice of deficiency determined that petitioners must include the entire $550,000 Lindsey settlement in gross income. Respondent now concedes that petitioners need only include $400,000 of the settlement amount, and not the $150,000 paid to petitioner's and CRI's attorneys.  Respondent contends that petitioners received the $400,000 as a constructive dividend from CRI because Lindsey's intent in settling the suit was to compensate CRI for economic damages.  Petitioners concede that $50,000 of the $400,000 was taxable income to them as a constructive dividend from CRI.  We thus address whether petitioners may exclude from gross income the remaining $350,000 they received pursuant to the Lindsey settlement agreement.

### a.  Allocation in the Settlement Agreement

The Lindsey settlement agreement allocates $50,000 of the settlement to CRI and the remaining $500,000 to petitioner "individually for mental anguish, pain and suffering, damage to his reputation and loss of good will".  Petitioners argue that the allocation in the Lindsey settlement agreement is controlling for tax purposes because an express allocation is the most important factor in determining the effect of a settlement and because the parties were adversarial when the agreement was executed.  Respondent contends that the written allocation should be disregarded because it was not adversarial or made at arm's

length, was entirely tax-motivated, and did not accurately reflect the claims at issue in the lawsuit. We agree with respondent.

The record in this case makes clear that the parties to the Lindsey settlement were not adversarial with respect to allocations made in the settlement agreement. The record amply demonstrates that Lindsey was not concerned with how the settlement proceeds were allocated between the various claims asserted against it in the lawsuit. Lindsey's attorney testified that he did not care how the proceeds were allocated; his only concern was a release of all claims. Lindsey's attorney testified that there was no negotiation of the terms of the allocation, and there is no evidence in the record to suggest otherwise.

Petitioner argues, in effect, that the allocation was the product of an adversarial process because Lindsey and petitioner and CRI were adversaries in a lawsuit which had not been settled prior to reaching agreement on the allocation. Petitioner distinguishes the instant case from the facts in Robinson v. Commissioner, supra, where the parties to the lawsuit had signed an agreement covering the amount of the settlement prior to agreeing on an allocation.

We believe petitioner misconstrues the requirement that allocations in settlement agreements be adversarial. There is

nothing in our opinion in <u>Robinson</u>, or the affirmance by the Court of Appeals for the Fifth Circuit, to suggest that the prior agreement as to the settlement amount was critical to the finding that the allocations at issue were not adversarial.  Our finding in <u>Robinson</u> was based upon a number of facts and circumstances, which are also present in this case.  Parallels include testimony from the payor's attorney that the parties were not adverse as to the allocation language, that the allocation language was unilaterally drafted by the payee, and that the allocation language was not drafted until after the issue of the amount of settlement had been decided.  The record in this case does not show that any negotiation over the specifics of the allocation occurred.

It is also clear in this case, as in <u>Robinson</u>, that the allocation language sought by petitioner was entirely tax-motivated.  Petitioner instructed the attorney representing him in the settlement negotiations to make sure he inserted the "proper personal injury language" so that proceeds could be received free of tax.  The attorney consulted an accountant for this purpose, who provided "boilerplate" language.

Finally, as in <u>Robinson</u>, the allocation language does not reflect the realities of the settlement.  For example, the allocation is made to petitioner for, inter alia, "damage to his reputation and loss of goodwill".  However, nowhere in the

pleadings or elsewhere in the record of the underlying litigation did petitioner claim such damage as a result of Lindsey's actions.

Based on the foregoing, we find that the allocation in the Lindsey settlement agreement was not the product of adversarial negotiation, and thus we disregard it.

b.  Nature of the Underlying Claim

Having disregarded the express allocation, we must examine the facts and circumstances surrounding the settlement to determine "In lieu of what" the damages were paid.  Robinson v. Commissioner, 102 T.C. at 126.  Petitioners contend that Mr. Burditt had a mental anguish claim against Lindsey, which Lindsey paid to settle.  The record does not support this contention.

Mr. Burditt did not assert any claims in his individual capacity against Lindsey in the original and first amended petitions.  The intent of the second and third amended petitions with respect to any individual claims by Mr. Burditt for mental anguish was ambiguous.  The second and third amended petitions assert a claim under the Texas Deceptive Trade Practice Act - Consumer Protection Act (DTPA), and petitioners argue that recoveries for mental anguish claims are permitted under the DTPA.  However, it is not clear from the language in the pleadings whether Mr. Burditt or CRI is asserting the DTPA

claim.[4]  This ambiguity is resolved in the fourth amended petition, which makes clear that both "plaintiffs"--i.e., CRI and Mr. Burditt--are asserting claims under the DTPA, and expressly claims, for the first time, damages for "mental anguish, torment and heartache".[5]  However, the fourth amended petition was struck by the trial court as untimely, and any reinstatement of this pleading was speculative.  Moreover, it was Lindsey's attorney's opinion that the fourth amended petition would not be reinstated.

The lack of clarity in the pleadings was reflected in Lindsey's attorney's understanding of the claims that Lindsey was defending against.  Although Lindsey's attorney acknowledged that the blowout could have resulted in personal injuries, he testified that in his opinion petitioner did not have any valid

---

[4]  Whereas portions of the second and third amended petitions carefully distinguish between "CRI" and "Burditt", elsewhere the two are referred to collectively as "plaintiffs". In addition, the pleadings make occasional reference to "plaintiff" in the singular, without any indication whether the reference is to CRI or petitioner.  The DTPA claim is one such instance where "plaintiff" is used in the singular without clarity as to its referent.

[5] We note that sec. 104(a)(2), as applicable to the year at issue, was not limited to recoveries for "physical" injuries or sickness, and thus damages for emotional or psychological harms were eligible for exclusion thereunder.  See Commissioner v. Schleier, 515 U.S. 323 (1995).  As amended by the Small Business Protection Act of 1996, Pub. L. 104-188, sec. 1605(a), 110 Stat. 1755, 1838, current sec. 104(a)(2) limits the exclusion to damages "on account of personal physical injuries or physical sickness".  (Emphasis added.)

personal claim under the DTPA against Lindsey because the Lindsey tools were sold to CRI, not to petitioner.[6]

Further, in a motion for summary judgment, Lindsey contended that petitioner had no individual claims against it. In the response to this motion, CRI and petitioner made several arguments, but did not dispute the contention that petitioner had no individual claims. In its trial brief, Lindsey did not address any claim by petitioner for mental anguish or any variant of emotional distress. Lindsey's attorney testified that he did not depose Mr. Burditt in preparation for trial, although he would have done so if he believed Mr. Burditt was pursuing personal injury claims. Similarly, in reports filed for purposes of mediation, in which the parties were required to state the disputed issues of fact and law, neither party mentioned mental anguish claims by Mr. Burditt; instead, the parties focused on CRI's economic claims.

Based on the facts and circumstances surrounding the settlement, giving particular emphasis to the intent of the payor, we do not believe that the amounts paid pursuant to the Lindsey settlement were received "on account of personal injuries or sickness" within the meaning of section 104(a)(2). To the

---

[6] CRI's and Mr. Burditt's own attorney in the lawsuit also testified that he did not believe that Mr. Burditt had any claim in his individual capacity against Lindsey. However, we give little weight to this testimony because at the time of trial the attorney had been sued by Mr. Burditt.

extent any settlement amounts were paid to CRI, we sustain respondent's determination, which petitioners have not addressed, that petitioners received them as constructive dividends.

## 2. Halliburton Settlement

In the notice of deficiency, respondent determined that petitioners must include in gross income the full amount of Halliburton's $200,000 settlement payment. Petitioners contend that the Halliburton settlement is excludable from their gross income as it was received by Mr. Burditt on account of personal injuries.

### a. Allocation in the Settlement Agreement

The Halliburton settlement agreement expressly allocated the full $200,000 settlement solely to Mr. Burditt "for mental anguish, pain and suffering, damage to his reputation and loss of good will." As with the allocation in the Lindsey settlement agreement, petitioners contend that the allocation in the settlement agreement is controlling for tax purposes, while respondent argues that the written allocation should be disregarded.

We agree with respondent because Halliburton, and petitioner and CRI, were not adversarial with respect to the allocation in their settlement agreement. Cf. Robinson v. Commissioner, 102 T.C. 116 (1994). Although Halliburton's attorney initially rejected the language allocating the entire proceeds to personal

injuries of Mr. Burditt, he did not object because Halliburton did not want any amount allocated to Mr. Burditt; rather, Halliburton's attorney was concerned that a failure to allocate any amount to CRI might fail to bind CRI to the settlement. Once satisfied that CRI's agreement to dismiss its summary judgment appeal would preclude any later reassertion of CRI's claims, Halliburton's attorney agreed to an allocation of the entire proceeds to Mr. Burditt because Halliburton was otherwise indifferent as to how the settlement proceeds were allocated. Halliburton's attorney testified that the personal injury allocation was not an item of contention between the parties and that he "didn't care if they put it in there or not."

Further, as in Robinson, the allocation did not reflect the realities underlying the settlement with Halliburton and petitioner's insertion of it was entirely tax-motivated. Similar to the Lindsey settlement agreement, the Halliburton settlement agreement partially allocates the award to petitioner for damage to his reputation, notwithstanding the fact that it was never claimed that Halliburton's actions had resulted in this type of damage. In addition, the personal injury allocation in the Halliburton agreement was based on the language used in the Lindsey agreement, obtained from an accountant for the purpose of securing tax-exempt treatment.

As with the allocation in the Lindsey agreement, we disregard the allocation in the Halliburton settlement agreement as it was not the product of adversarial negotiation.

b.  Nature of the Underlying Claim

Disregarding the allocation in the settlement agreement, we look to the nature of the underlying claim for which the settlement was paid.  See Robinson v. Commissioner, supra at 126; Threlkeld v. Commissioner, 87 T.C. at 1297.  Unlike his claims against Lindsey, Mr. Burditt in every version of the petitions asserted tort type claims against Halliburton for mental anguish, as follows:

> CRI and Burditt would show that Halliburton's actions contributed to damage occurring to the Davis No. 1 well and that that has caused CRI and Burditt economic damages * * *.  Additionally, Burditt would show that Halliburton's actions constituted duress and caused him severe embarrassment and mental anguish.

Respondent argues that, notwithstanding the repeated references to mental anguish in the petitions, Mr. Burditt abandoned his mental anguish claims during the course of the litigation.  Respondent relies on several factors to support this interpretation.  Respondent places particular emphasis on petitioner's and CRI's response to a Halliburton interrogatory asking the nature of the damages Halliburton caused to CRI and petitioner, in which they cite only economic damages to the well. Respondent also points out that during discovery Halliburton never took Mr. Burditt's deposition, that Halliburton addressed

only the economic claims of CRI and Mr. Burditt in its mediation submission, and that Halliburton's attorneys testified that they were only concerned with the claims for economic damages to the well. Contemporaneous correspondence between the Halliburton attorneys substantiates that a primary influence on their decision to settle for $200,000 was the estimated cost of defending against CRI's economic claims, specifically the cost of obtaining expert testimony to counter the CRI expert witness who valued the well formation damages at more than $3 million. Finally, respondent points out that Mr. Burditt's own counsel in the blowout litigation testified that he believed the focus of the case was on CRI's claims for economic damages.

It is clear from the record that Halliburton was concerned about the economic claims of CRI and Mr. Burditt. However, we are not convinced that petitioner abandoned the mental anguish claim that was repeatedly restated in the amended petitions, nor do we believe, given the substantial evidence of deliberate actions by Halliburton's employees that were life-endangering, that Halliburton was not also concerned about exposure to mental anguish claims should the case go to a jury. We believe that Halliburton was concerned both with economic damages to the well formation and with exposure to mental anguish claims and punitive damages arising from the actions of its employees. CRI and petitioner had the depositions of at least five eyewitnesses who

all corroborated the allegation that Halliburton employees had deliberately and repeatedly ceased efforts to control the well blowout in order to extract concessions from petitioner and CRI.[7] Halliburton's own counsel conceded at the trial of this case that he believed a jury would resolve against his client the question of whether the shutoff of pumping was intentional.

In arguing that Halliburton intended to settle only economic claims, we believe respondent relies too heavily on the interrogatory response in which CRI and petitioner fail to include mental anguish among the damages they allege by Halliburton. The interrogatory eliciting this response was immediately preceded by an interrogatory that could be interpreted as confining the inquiry to damages to the well. As to Halliburton's failure to take Mr. Burditt's deposition, Halliburton's attorney conceded at the trial of this case that further discovery would have been undertaken to clarify Mr. Burditt's personal injuries if the case had not settled.

Respondent also emphasizes the failure of either party to obtain expert testimony concerning mental anguish or other personal injuries. However, expert testimony would not have been

---

[7] The depositions of these witnesses are cited not for the truth of the matters asserted, but for the nonhearsay purpose of showing the evidence that Halliburton's attorneys knew they would face in any trial of Mr. Burditt's claims.

required to support a mental anguish claim. The testimony of the eyewitnesses to Halliburton's actions may have been sufficient.

Moreover, the assessment of Mr. Burditt's then-attorney--namely, that the claim against Halliburton was primarily for economic damages--must be considered in light of the fact that at the time of the trial of this case, the attorney was being sued by Mr. Burditt with respect to his handling of the blowout litigation. Also, notwithstanding this assessment, the attorney testified that he intended to use the actions of Halliburton's employees to incite the jury.

Considering all the facts and circumstances of the litigation, we simply do not accept Halliburton's attorneys' contention at the trial of this case that they were concerned only with Halliburton's exposure for damages to the well formation. They may simply have been reluctant to concede a client's exposure to punitive damages. We find it inconceivable that someone at Halliburton reviewing this lawsuit did not believe the company had exposure for mental anguish and/or punitive damages should the case get to a jury. We conclude that Halliburton paid to settle not only economic claims for damage to the well but also Mr. Burditt's mental anguish claim, and to avoid the risk of punitive damages.

Because we are convinced that the Halliburton settlement was both for economic damages as well as for mental anguish and/or

punitive damages, we must estimate the portion of the payment attributable to each. Cf. Bayou Verret Land Co. v. Commissioner, 450 F.2d 850, 858 (5th Cir. 1971), affg. in part, revg. in part and remanding 52 T.C. 971 (1969); Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). In such an instance, we make as close an approximation as possible and may choose to bear heavily upon the taxpayer "whose inexactitude is of his own making." Cohan v. Commissioner, supra at 543-544. Given that there is little or no evidence of the extent of economic damages to the well caused by Halliburton's delay in controlling the blowout, and the inherent imprecision in measuring mental anguish or punitive damages, we estimate that half of the Halliburton settlement ($100,000) was paid to settle the claim for economic damages to the well and therefore is not excludable from petitioners' gross income.[8] We estimate that the remaining $100,000 was paid to settle Mr. Burditt's claim for mental anguish or for punitive damages. Guided by the pleadings filed by CRI and Mr. Burditt which sought $10 million in actual damages and $5 million in punitive damages, we allocate two-thirds of the remaining $100,000 as paid in lieu of defending against Mr. Burditt's claim for mental anguish and

---

[8] To the extent amounts were paid to CRI rather than petitioners, we sustain respondent's determination, which petitioners have not addressed, that petitioners received constructive dividends from CRI.

one-third as paid in lieu of defending against the claim for punitive damages. The amount allocated to Mr. Burditt's claim for mental anguish ($66,667) is excludable from petitioners' gross income as damages received on account of a personal injury, sec. 104(a)(2), while the amount allocated to punitive damages ($33,333) is not. See O'Gilvie v. United States, 519 U.S. 79 (1996).

3. Section 6662 Penalty

For petitioners' 1992 tax year, respondent determined that petitioners are liable for the section 6662(b)(2) penalty for the substantial understatement of tax, or in the alternative, for the section 6662(b)(1) penalty for negligence or disregard of the rules or regulations. Respondent's determinations are presumed correct, and petitioners bear the burden of proving that the penalty does not apply. See Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of an underpayment of tax attributable to negligence or disregard for rules or regulations or any substantial understatement of income tax. The term "negligence" includes a failure to make a reasonable attempt to comply with the provisions of the Internal Revenue laws, and "disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2),

Income Tax Regs. An understatement of tax is substantial if it exceeds the greater of 10 percent of the tax required to be shown in the return or $5,000. See sec. 6662(d)(1)(A)(i) and (ii).

The penalty for negligence or disregard of rules or regulations or for the substantial understatement of income tax is inapplicable, however, to any portion of the underpayment for which the taxpayer can show that he acted in good faith and had reasonable cause. See sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the relevant facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer may demonstrate reasonable cause if he can show that he relied in good faith on a qualified adviser after full disclosure of all necessary and relevant information. See Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1061 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners assert they have shown reasonable cause because their return was prepared by a certified public accountant. Other than petitioner's self-serving testimony that the accountant was "aware of the settlement", there is no evidence in the record concerning the information that was provided to the

accountant. The accountant was not called to testify. We believe it likely that the accountant was aware only of the terms of the settlement agreement, and not the surrounding circumstances. Petitioners have in any event failed to show that there was full disclosure. We accordingly reject their claim of reasonable cause.

The penalty for the substantial understatement of income tax is inapplicable if there is or was substantial authority for the position taken on the return. See sec. 6662(d)(2)(B)(i). A taxpayer's return position has substantial authority if the weight of the authority supporting that position is substantial as compared to the weight of the authority supporting contrary treatment. See sec. 1.6662-4(d)(3)(i), Income Tax Regs. The standard is an objective one that is less stringent than the "more likely than not" standard (more than a 50 percent likelihood of being upheld), but more stringent than the "reasonable basis" standard (which if met avoids the negligence penalty under section 6662(b)(1)). See sec. 1.6662-4(d)(2), Income Tax Regs. An authority is accorded little weight if it shares only some of the facts of the tax treatment at issue and is otherwise materially distinguishable. See sec. 1.6662-4(d)(3)(ii), Income Tax Regs.

We find that petitioners had substantial authority for excluding the Lindsey and Halliburton settlement amounts. When

petitioners took this return position, the extent to which written allocation provisions in a settlement agreement controlled the tax treatment of the settlement payments was not clear. While it had been established prior to the year in issue that specific allocations in a settlement agreement did not necessarily control, see Threlkeld v. Commissioner, 87 T.C. at 1306-1307; Mitchell v. Commissioner, T.C. Memo. 1990-617, affd. without published opinion 992 F.2d 1219 (9th Cir. 1993), many opinions prior to 1994 could be interpreted to imply that, where there was express language in a settlement agreement making an allocation, such language could be dispositive. See Stocks v. Commissioner, 98 T.C. 1, 10 (1992) ("If the settlement agreement lacks express language stating what the settlement amount was paid to settle, then the most important factor in determining any exclusion under section 104(a)(2) is the 'intent of the payor' as to the purpose in making the payment."); Metzger v. Commissioner, 88 T.C. 834, 847 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); Bent v. Commissioner, 87 T.C. 236, 244 (1986), affd. 835 F.2d 67 (3d Cir. 1987). Robinson v. Commissioner, 102 T.C. at 127, decided in 1994, clarified that a written allocation in a settlement agreement is respected only if the parties were adversarial with respect thereto. Robinson clearly resolves the issue raised by the allocation provisions in this case, but it had not been decided when petitioners took

their return position.  Prior to <u>Robinson</u>, we believe petitioners at least had substantial authority for their position that the express language in the settlement agreements controlled. Accordingly, for purposes of the substantial understatement penalty, the amount of any understatement is reduced by that portion of the understatement attributable to the exclusion of the Lindsey and Halliburton settlement payments.  As the substantial authority standard of proof is more stringent than that of reasonable basis, see sec. 1.6662-4(d)(2), Income Tax Regs., we also find petitioners were not negligent with respect to the underpayment attributable to the exclusion of the settlement payments.

<u>Decision will be entered under Rule 155</u>.